**Wallace G. WILKINSON and Russell C. Weaver, Plaintiffs,**

**v.**

**Brereton C. JONES, in his official capacity as Governor of the Commonwealth of Kentucky; Chris F. Gorman, in his official capacity as Attorney General of the Commonwealth of Kentucky; Kentucky Registry of Election Finance; Joe Terry, in his official capacity as Chair of the Kentucky Registry of Election Finance; Nicholas N. King, in his official capacity as Jefferson County Commonwealth Attorney; and Michael E. Conliffe, in his official capacity as Jefferson County Attorney, Defendants.**

Civ. A. No. 94–0664–L(S).

United States District Court, W.D. Kentucky, at Louisville.

Jan. 27, 1995.

David A. Friedman, Taustine, Post, Sotsky, Berman, Fineman & Kohn, Louisville, KY, for plaintiffs and counter-claimants, Wallace Wilkinson and Russell C. Weaver.

Frank F. Chuppe, Virginia Hamilton Snell, Wyatt, Tarrant & Combs, Louisville, KY, for defendant, Brereton C. Jones, in his official capacity as Governor of Com. of Kentucky.

Chris Gorman, William B. Pettus, Office of Atty. Gen., Frankfort, KY, for defendant and counter-claimant, Chris Gorman, in his official capacity as Attorney General of Com. of Kentucky and defendant, Nicholas King, in his official capacity as Jefferson County Com. Atty.

Sheryl G. Snyder, David B. Tachau, Jacquelyn P. Elmore, Brown, Todd & Heyburn, Louisville, KY, for defendant and counter-claimant, Kentucky Registry of Election Finance, and defendant and counter-claimant, Joe Terry, in his official capacity as Chair of Kentucky Registry of Election Finance.

N. Scott Lilly, Jefferson County Attys. Office, Louisville, KY, for defendant, Michael Conliffe, in his official capacity as Jefferson County Atty.

Richard V. Beliles, Louisville, KY, for League of Women Voters of Kentucky, amicus and Common Cause of Kentucky, amicus.

### *MEMORANDUM OPINION*

SIMPSON, Chief Judge.

This matter is before the court on motion of the plaintiffs, Wallace G. Wilkinson and Russell C. Weaver, for issuance of a preliminary injunction pursuant to Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 65(a). The court heard oral argument on the motion on

January 20, 1995. This memorandum opinion shall constitute findings of fact and conclusions of law by the court. This action is brought under the aegis of the Civil Rights Act, 42 U.S.C. § 1983.

The plaintiffs seek a preliminary injunction barring enforcement of certain provisions of Kentucky Revised Statutes ("KRS") Chapter 121, the Campaign Finance Regulation, and Chapter 121A, the Public Financing Campaign Act, which they contend are unconstitutional.

The defendants are Brereton C. Jones, Governor of the Commonwealth of Kentucky; Chris F. Gorman, Attorney General of the Commonwealth of Kentucky; the Kentucky Registry of Election Finance; Joe Terry, Chair of the Kentucky Registry of Election Finance; Nicholas N. King, Jefferson County Commonwealth Attorney; and Michael E. Conliffe, Jefferson County Attorney. The individuals named as defendants in this lawsuit have been sued solely in their official capacities.

The plaintiff, Wilkinson, is a potential candidate for Governor of Kentucky who would run for office as a member of a privately-financed slate of candidates. The plaintiff, Weaver, is an individual citizen who wishes to communicate his views about political candidates and elections.

The plaintiffs claim that certain provisions of KRS Chapters 121 and 121A impermissibly infringe upon their rights guaranteed by the First Amendment to the United States Constitution. They have brought suit under 42 U.S.C. § 1983 alleging that the defendants, acting under color of state law, have violated their civil rights. In pertinent part, the First Amendment provides that " 'Congress shall make no law ... abridging the freedom of speech....' The Due Process Clause of the Fourteenth Amendment has been construed to make this prohibition applicable to state action [citations omitted]." *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——–—— n. 1, 113 S.Ct. 1505, 1507–08 n. 1, 123 L.Ed.2d 99 (1993).

January 31, 1995 is the deadline for individuals to file the required papers to become candidates for Governor of Kentucky. Wilkinson and Weaver claim that a number of provisions of the campaign finance laws have a chilling effect on their speech and will hinder their participation in the election process. They urge that this court enjoin the enforcement of those provisions prior to the deadline on the basis that they are unconstitutional. They contend that they are suffering the chill of these impinging provisions even now because they feel compelled to decline participation in the election process as long as these provisions remain in force.

## I. THE STATUTORY SCHEME

In recent years, the Kentucky legislature has passed campaign reform legislation designed to encourage participation in a regulated public funding scheme. The bulk of the legislation was passed by the 1992 General Assembly with some additional modifications effective in 1994.

A qualifying slate of candidates can obtain public matching funds in exchange for agreement to abide by the funding plan's fundraising and spending restrictions. This scheme offers as an inducement to qualifying slates two public funding dollars for every dollar privately raised by the slate. Publicly-funded slates agree to limit private contributions they accept in each of the primary and general elections to a total of $600,000. The total expenditure limit for publicly-funded slates of candidates, including the $1.2 million available in 2–to–I matching funds is $1.8 million. KRS 121A.030(1) and 121A.060(2).

There are no limitations on total contributions accepted or expenditures made by privately-financed slates of candidates. In the event that a privately-financed slate receives contributions or makes expenditures in excess of the publicly-funded slates' spending limit of $1.8 million, the $1.8 million cap is lifted from publicly-funded slates enabling them to continue spending and private fundraising, and to continue receiving matching funds. KRS 121A.030(5)(a); 121A.060(2)(c); 121A.080(4) and (5).

KRS 121A.050 establishes different contribution limits per election year for publicly- and privately-financed slates. The provision (1) restricts persons, permanent committees,

and various other entities from making contributions in excess of the contribution limits, and (2) restricts the slates from accepting contributions in excess of the amount. Publicly-financed slates are limited to contributions of not more than $500 per person or entity per year. Privately-financed slates are limited to $100 per person or entity per year.

KRS 121.175 establishes that "polling and consulting" are included as allowable campaign expenditures and bars the expenditure of campaign funds until the filing of candidacy papers.

A number of other provisions are also at issue in this case. KRS 121.150(2) provides:

> [T]he solicitation from and contributions by candidates, slates of candidates, campaign committees, political issues committees, permanent committees, and party executive committees to any religious, charitable, civic, eleemosynary, or other causes or organizations established primarily for the public good is expressly prohibited; except that it shall not be construed as a violation of this section for a candidate or slate of candidates to continue regular personal contributions to religious, civic, or charitable groups.

KRS 121.150(13) provides:

> No candidates running as a slate for the office of Governor and Lieutenant Governor shall make combined total personal loans to their committee in excess of fifty thousand dollars ($50,000) in any one (1) election....

KRS 121.150(20) provides:

> No slate of candidates for Governor and Lieutenant Governor or their immediate families shall loan any money, service, or other thing of value to their campaign, and all moneys, services, or other things of value which are loaned shall be deemed a contribution, which may not be recovered by the slate of candidates, except to the extent of a combined total of fifty thousand dollars ($50,000).

KRS 121A.030(4) provides:

> A slate of candidates for Governor and Lieutenant Governor that has filed a statement of intent to accept transfers from the fund and abide by the maximum expenditure limit that was not rescinded pursuant to KRS 121A.040(4) may receive contributions from permanent committees which, in the aggregate, shall not exceed twenty-five percent (25%) of the qualifying contributions received by the slate of candidates in any one (1) election. A slate of candidates that has filed a statement of intent to reject transfers from the fund and not abide by the maximum expenditure limit or one that has rescinded a statement of intent to accept transfers from the fund pursuant to KRS 121A.040(4) may receive contributions from permanent committees which, in the aggregate, shall not exceed twenty-five percent (25%) of the qualifying contributions received by the slate of candidates in any one (1) election up to a maximum of one hundred fifty thousand dollars ($150,000) in any one (1) election.

Finally, KRS 121.190(1) states:

> All newspaper or magazine advertising, posters, circulars, billboards, handbills, sample ballots, and paid-for television or radio announcements with reference to or intended for, the support or defeat of a candidate, slate of candidates, or group of candidates for nomination or election to any public office shall be identified by the words "paid for by" followed by the name and address of the payer, or the committee, organization, or association and its treasurer, on whose behalf the communication appears....

KRS 121.990(3) states that knowing violation of 121.190 is a Class D felony and includes "making any communication to support or defeat a candidate or slate or candidates without identification of sponsorship." KRS 121.990(3)(d).

## II. THE CLAIMS

The plaintiffs have challenged the constitutionality of these provisions of the election financing statutes, identifying eight allegedly fatal flaws:

1. Lower contribution limits are imposed

upon privately-financed candidates [1] than upon publicly-financed candidates;

2. The $100 contribution limit imposed upon privately-financed candidates is so low as to become coercive;

3. The amount of a privately-financed candidate's campaign spending operates as a trigger for the release of publicly-financed candidates from their spending limits and enables them to obtain additional public funds;

4. An aggregate limit of $150,000 in contributions from permanent committees is imposed upon privately-financed candidates without a corresponding limit applicable to publicly-funded candidates;

5. Citizens who express their views on any aspects of elections in Kentucky through distribution of posters, circulars, or handbills must identify themselves by name and address;

6. Exploratory polls by prospective candidates are barred;

7. Candidates are barred from loaning more than $50,000 to their own campaigns; and

8. Candidates are barred from making contributions to public-interest organizations (and the organizations may not solicit such contributions from candidates) unless the candidates have previously made regular personal contributions to those organizations.

One challenge has been resolved through a stipulation and two are not ripe for decision.

### A.

A stipulation with respect to the issue of exploratory polls by potential candidates was entered in the record on January 10, 1995.

It has been stipulated that the recent decision of the United States Court of Appeals for the Sixth Circuit in *Bunning v. Commonwealth of Kentucky*, 42 F.3d 1008 (1994), has made it likely that the plaintiffs will succeed on the merits of their claim challenging the prohibition on expenditures for polling and consulting by potential candidates.

The United States Court of Appeals stated:

> The Registry contends that Congressman Bunning used the poll, in part, to test the waters for a possible gubernatorial run, and this constituted "exploratory activity" prohibited by the new Public Financing Campaign Act. However, ... we have grave concerns that such a construction of the statute would have a profound chilling effect on the exercise of protected rights to free association and speech."

1994 Fed.App. 0416P (6th Cir.), slip op. pp. 10–11. The Registry therefore agreed to entry of an injunction prohibiting it from enforcing so much of KRS 121.170(1) as requires Wilkinson to be a formally declared candidate before he can register a campaign committee to accept contributions and make expenditures exploring his possible candidacy.

The stipulation includes the following statement:

> The Registry has, however, informed Wilkinson it will enforce KRS 121.150(1) by requiring that he register a committee through which to report all such expenditures, as well as all contributions, whether by him or from third parties, from which those expenditures are made. Wilkinson does not concede that the Registry may require him to do so.

The parties have agreed that this issue is not ripe for decision by the court.

### B.

KRS 121A.030(4) provides similarly for publicly- and privately-financed candidates that they may not receive contributions from permanent committees which, in the aggregate, exceed 25% of their qualifying contributions. The provision adds that the aggregate 25% cannot exceed $150,000 for privately-financed candidates.

---

1. In Section I of this opinion, we referred to "candidates" and "slates of candidates," as the statutes are written. For the most part, the remainder of the opinion refers to "candidates," since the issues in the case have been framed in terms of the impact of the statutes on candidates for the office of Governor. The plaintiff, Wilkinson, is at present a potential candidate and not a member of an announced slate of candidates.

The plaintiffs base their challenge to this provision on the fact that there is no $150,000 absolute limit placed upon publicly-financed candidates by KRS 121A.030(4).

In the event that no privately-financed candidate exceeds $1.8 million in contributions or expenditures, the publicly-funded candidates' private contribution limit is $600,-000. Since publicly-funded candidates are limited to 25% of the $600,000 in permanent committee contributions, all candidates in such a race are limited to $150,000.

When a privately-financed candidate's campaign exceeds $1.8 million, the publicly-financed candidates are released from their $1.8 million spending limit, may continue fundraising beyond the $600,000 contribution limit, and may receive matching funds for the additional amounts they raise. KRS 121A.030(5)(a); 121A.060(2)(c); 121A.080(4) and (5). The plaintiffs contend that since publicly-funded candidates may exceed the $600,000 contribution limit, they may also exceed the permanent committee contribution limit since the latter is based upon a percentage (25%) of the former.

The Registry and Attorney General Gorman have unequivocally stated in their answer with respect to KRS 121A.030(4) and 121A.030(5)(a): "Defendants state that, read together, the statutes do not permit Participating Slates to receive contributions from Permanent Committees in excess of $150,-000." Answer of Registry and Gorman at ¶ 20. The other defendants have acceded to the Registry's interpretation in their brief. The plaintiffs have stated that the construction given to KRS 121A.030(4) by the defendants affords them the relief they seek. There is, therefore, no justiciable controversy with regard to the statute's application after the $1.8 million limit has been exceeded. The court has not been requested to issue an injunction on this issue.

### C.

KRS 121.150(2) prohibits charitable contributions by various committees, including campaign committees. The provision also prohibits charitable contributions by candidates or slates of candidates, except those which continue a previous contribution pattern.[2]

The plaintiffs have alleged that charitable giving by candidates constitutes protected speech. They contend that to preclude candidates who do not have a prior giving history from contributing to charitable or public interest organizations serves no compelling interest in preventing corruption. They note that the requirement of prior giving discriminates against new charities and public interest groups and prevents candidates from developing new interests.

In their answer to the complaint, the defendants "deny that KRS 121.150(2) bars solicitation from, and contributions by, candidates to religious, charitable, civic, eleemosynary or other public interest organizations unless the candidate has previously made regular personal contributions to those organizations." Answer and Counterclaim of Registry of Election Finance, Joseph H. Terry, and Attorney General Chris Gorman, ¶¶ 23 and 35; *accord,* answers of the remaining defendants.

The Registry has explained in its memorandum in opposition to the motion for preliminary injunction, p. 3, n. 6, that:

[T]he Registry has interpreted the proviso to KRS 121.150(2) as not prohibiting natural persons from making charitable contributions when they become candidates for public office. As interpreted by the Registry, KRS 121.150(2) only prohibits registered committees, including candidates' campaign committees, from making charitable contributions. *See,* Answer at ¶ 23. Since both Plaintiffs are natural persons, and neither is a registered committee, the Registry's interpretation renders their challenge to this statute moot.

Thus, the defendants' interpretation of the statute is in accord with the position taken by the plaintiffs. They agree that candidates may make charitable contributions regardless of any prior giving history. This accord

---

**2.** The statute prohibits solicitation as well as contributions. However, no issue has been raised with respect to solicitation.

subsumes the issue. The court has not been requested to issue relief on this claim.

## III. INJUNCTIVE RELIEF STANDARD

Five substantive challenges remain for consideration by this court as to the propriety of issuing preliminary injunctive relief.

■ The court must consider the claims of the plaintiffs in the context of the four factors the court utilizes in assessing requests for injunctive relief:

1. Whether the movant is likely to prevail on the merits;

2. Whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. Whether a preliminary injunction would cause substantial harm to others; and

4. Whether a preliminary injunction would be in the public interest.

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,* 23 F.3d 1071, 1076 (6th Cir.1994), citing *International Longshoremen's Association v. Norfolk Southern Corporation,* 927 F.2d 900, 903 (6th Cir.1991), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991).

In *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 538 (6th Cir.), *cert. denied,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), the United States Court of Appeals for the Sixth Circuit stated:

In general, the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.... It thus appears that the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words.

*Roth,* at 538, quoting *Metropolitan Detroit Plumbing and Mechanical Contractors Association v. HEW,* 418 F.Supp. 585, 586 (E.D.Mich.1976).

## IV. IRREPARABLE HARM

As a threshold matter, we must address the issue of the plaintiffs' standing to pursue this action. The defendants have utilized the issue of standing and the matter of a purported two-year delay in bringing the action to argue that the plaintiffs will not suffer irreparable harm and are therefore not entitled to injunctive relief.

■ First, the defendants contend that because Wilkinson has not definitively declared that he *will* run for Governor if the purported burdens which the election statutes place upon him are lifted by this court. Instead, Wilkinson has stated only that he "may run for Governor of Kentucky." Complaint at ¶ 27. The defendants contend that the alleged harm to Wilkinson is purely speculative. Should he choose not to run, he would suffer no harm by operation of the campaign financing laws.

Wilkinson has stated, however, that as long as the statutes stand in their present form he *will refrain* and *is refraining* from running for office. "It is well-settled that a chilling effect on one's constitutional rights constitutes a present injury in fact. [citations omitted]." *G & V Lounge, Inc.,* 23 F.3d at 1076. We find that this burden moves Wilkinson's claims beyond the realm of speculative injury. Wilkinson need not pronounce to a certainty that he will run for office if he obtains the requested relief. It is sufficient that he has alleged that his choice to run is hindered by the statutes he challenges as unconstitutional.

■ Weaver has stated he wishes to communicate about candidates in various ways, including displaying or distributing posters, circulars, or handbills in Jefferson County expressing his views for the support or defeat of candidates, and wishes to do so without identifying himself by name and address. Complaint at ¶ 32. Weaver contends that he is required by the statutes to identify himself on any advertisements which he chooses to disseminate. He claims that his speech is constrained because he is precluded from communicating his electoral views anonymously.

We find that the alleged chilling of Weaver's free speech right is sufficient to afford him standing to sue in this case.

The defendants contend that because the plaintiffs did not bring suit at the time that the bulk of the legislation was passed in 1992, there must not be an urgency for the requested relief. As a corollary to that argument, they contend that any urgency that may now exist is of the plaintiffs' own making.

We find neither of these arguments to be compelling. At this point in time, potential candidates for the gubernatorial campaign must decide whether to become actual candidates by filing their candidacy papers. They must make this decision by the end of January. As the time for filing draws near, possible candidacies become realities. All candidates will be bound by the campaign financing statutes and their contours. By merely announcing their candidacies, candidates agree to play by the rules. It is clear to this court that there are some significant questions as to what the rules are. As soon as candidacies are announced and the campaign process begins, citizens such as Weaver may feel compelled to speak but may feel constrained to do so because of the questions raised about the disclosure requirement.

It appears that the passage of time since the statutes were passed did not render the plaintiffs' claims stale. Rather, the questions are now crystallized and present some urgency in light of the potential infringement on core constitutional freedoms.

The United States Supreme Court has stated:

> And if it be conceded that the First Amendment was "fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–72, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971).

The First Amendment also "entails solicitude not only for communication itself, but also for the indispensable conditions of meaningful communication." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 588, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980). The United States Supreme Court has specifically identified expenditure limitations as "substantial and direct restrictions on the ability of candidates, citizens and associations to engage in protected political expression." *Buckley v. Valeo*, 424 U.S. 1, 58–59, 96 S.Ct. 612, 654, 46 L.Ed.2d 659 (1976).

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976), citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). We find, therefore, that any impermissible constraint upon the exercise of free speech by the challenged statutes would engender immediate and irreparable harm to the plaintiffs.

## V. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The Process for Evaluating Constitutional Claims

■ In evaluating each of the four substantive provisions which are challenged, the court must engage in a three-pronged inquiry. The United States Court of Appeals for the Eighth Circuit identified these factors in *Day v. Holahan*, 34 F.3d 1356, 1360–61 (8th Cir.1994). (1) Does the provision impose a content-based restriction on freedom of speech,[3] (2) is the provision narrowly tailored, and (3) does it address a compelling state interest? Only when content-based restrictions on speech are narrowly tailored to meet a compelling state interest may they be upheld as constitutional.

---

**3.** The parties agree that if there is a restriction on speech imposed by these statutes, it is content-based for purposes of the remainder of the analysis.

The defendants state that the over-arching compelling state interest sought to be addressed by the campaign financing statutes is to combat corruption and the appearance of corruption in the Kentucky election process. The defendants urge that such election reforms promote, rather than hamper, free speech and advance the interests of democratic self-government.

*Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Federal Election Commission v. National Right to Work Committee*, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982), and many other cases clearly hold that states may regulate their elections to protect the integrity of the electoral process. The United States Supreme Court stated in *Buckley*, 424 U.S. at 66, 96 S.Ct. at 657, "We have acknowledged that there are governmental interests sufficiently important to outweigh the possibilities of infringement, particularly when the 'free functioning of our national institutions' is involved." In *Buckley*, the Court found permissible the use of "public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Buckley*, 424 U.S. at 92–93, 96 S.Ct. at 669–70.

■ Kentucky has put in place a public funding scheme which provides inducements to qualifying candidates to accept certain restrictions designed to combat corrupt influences and promote "uninhibited, robust, and wide-open" debate on public issues. *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

The plaintiffs do not dispute that the Kentucky legislature has the power to craft a public funding scheme in an effort to cure the ills of the Commonwealth's election process, nor do they challenge the laudatory goal and compelling state interest therein. Rather, they challenge certain particular provisions on the basis that (1) they do not address a compelling state interest and/or (2) they are not sufficiently narrowly tailored to survive the highest scrutiny which must be applied to such provisions.

We will address the challenges made to each statutory provision in turn.

## B. The "Trigger Provision"

■ KRS 121A.030(5)(a), the so-called "trigger provision," operates to release publicly-funded candidates from their voluntarily accepted expenditure limit of $1.8 million when a privately-financed opponent exceeds that amount in either contributions or expenditures. When the release is triggered, the publicly-funded candidate may resume fundraising and can obtain matching funds for any additional privately-raised amounts. KRS 121A.080(4) and (5); 121A.060(2)(c).

The plaintiffs urge that this provision does not address a compelling governmental interest. They contend that the provision impermissibly utilizes the "amount of speech" of a privately-financed candidate measured in the dollars that the speech costs (*i.e.*, t.v. spots, newspaper ads, billboards), to trigger the release of the limitations on the publicly-financed candidates.

In *Buckley*, 424 U.S. at 57 n. 65, 96 S.Ct. at 653 n. 65, the Court stated that "just as a candidate may voluntarily limit the size of contributions he chooses to accept, he may decide to forego private fund-raising and accept public funding." In *Republican National Committee v. Federal Election Commission*, 487 F.Supp. 280, 284 (S.D.N.Y.), *aff'd mem.*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) the Court reiterated the statement from *Buckley*. In that case which involved constitutional challenges to various provisions of the Presidential Election Campaign Fund Act and the Federal Election Campaign Act of 1971, the Court stated, in pertinent part:

In view of our finding that a presidential candidate is not compelled to accept public financing under the statutes or to accept the limitations imposed ... we are left with the issue of whether Congress may lawfully condition a presidential candidate's eligibility for public federal campaign funds upon the candidate's voluntary acceptance of limitations on campaign expenditures and private contributions ... if so, is the effect of the law to abridge either (a) the rights of the candidate or (b) the rights of his or her supporters. We have no difficulty concluding that the imposition

of such conditions lies within Congress' power to legislate under the General Welfare Clause and that, as long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate First Amendment rights of the candidate or supporters.

*Republican National Committee,* 487 F.Supp. at 284. Clearly, candidates may choose private financing and its attendant restrictions.

The plaintiffs contend that the trigger provision is coercive by effectively punishing private candidates for exercising their right to forego the public funding option. They suggest that the speech of private candidates is chilled as their contributions or expenditures near the $1.8 million mark because they know that if their campaigns exceed $1.8 million they will trigger the release of publicly-funded opponents from their fundraising constraints and thus open the door to unlimited competition with their opponents.

The plaintiffs rely in part on *Day v. Holahan,* 34 F.3d at 1360, where the court stated that:

> [T]he knowledge that a candidate who one does not want to be elected will have her spending limits increased and will receive a public subsidy equal to half the amount of the independent expenditure, as a direct result of that independent expenditure, chills the free exercise of that protected speech."

█ This quote reveals certain facts which distinguish *Day* from the case before us. First, in *Day,* the triggering activity was the making of any independent expenditure in support or defeat of a candidate. By definition, an independent expenditure is an act not within the control of the candidate. By contrast, in this case the determination whether to engage in the triggering activity (*i.e.,* the decision to take the campaign beyond $1.8 million) is within the privately-financed candidate's complete control. The trigger provision in *Day* began with the first dollar spent in an independent expenditure. It provided an automatic increase in the expenditure limit in an amount equal to the independent expenditure, and further, pro-

vided an automatic public subsidy equal to half of the amount of the independent expenditure. Kentucky's trigger provision operates only to release the publicly-funded candidate from the $1.8 million expenditure limit. It occurs only when $1.8 million has already been contributed or spent in the campaign. While matching funds are available to the publicly-funded candidate, they may only be obtained when additional private contributions are raised.

We find these distinctions to be significant. While the trigger provision in *Day* seeks to forcibly equalize the contest by directly subsidizing the opposition, there is no such problem with the Kentucky statute. KRS 121A.030(5)(a) merely expands the breadth of the contest, permitting but not requiring the publicly-funded candidate to respond to the additional speech in which the privately-financed candidate has chosen to engage.

There is also a distinction with regard to the matter of choice. Under the Minnesota statute in *Day,* an independent expenditure is defined as " 'an expenditure expressly advocating the election or defeat of a clearly identified candidate,' but one made neither with the consent or authorization of the candidate nor at his request or suggestion." *Day,* 34 F.3d at 1359. A chill on First Amendment rights is more readily apparent under a statute such as the one in *Day* where an automatic financial disincentive is felt at the spending of the first dollar on speech of independent expenders. Under the Kentucky statute, the determination whether to exceed $1.8 million and thus trigger the release of the opposition is a calculated strategic decision to be made by the privately-financed candidate. This decision must be made in the context of his campaign plan and only after $1.8 million in speech on the issues has already taken place.

█ As the privately-financed candidate nears the $1.8 million mark, there already would have been a significant amount of unconstrained speech on the issues. As noted in *Republican National Committee,* 487 F.Supp. at 285, "Not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive

such a right, is invalid." This court is not convinced that KRS 121A.030(5)(a) impermissibly chills the speech of privately-financed candidates simply because it enables the speakers' adversaries to respond. It occurs to this court that the trigger provision promotes more speech, not less.

Assuming, for the sake of argument, that the trigger provision chills speech to some degree, we find that it is a narrowly tailored means which addresses a compelling state interest. Kentucky has a compelling interest in encouraging candidates to accept public financing and its accompanying limitations which are designed to promote greater political dialogue among the candidates and combat corruption by reducing candidates' reliance on fundraising efforts. *See, Vote Choice, Inc. v. DiStephano,* 4 F.3d 26 (1st Cir.1993).

The state may limit total campaign expenditures for publicly-funded candidates under the rationale that such limitations help limit corruption spawned by large campaign contributions. Without the trigger provision, the expenditure limitation would be absolute. Such a limitation may discourage candidates from accepting public financing in the face of expenditure-unlimited privately-financed opponents. The trigger provision protects a publicly-funded candidate from being grossly outspent by lucrative privately-financed campaigns. The provision prevents the publicly-funded candidate from being penalized for deciding to accept public funds. Thus it is a narrowly tailored provision which comes into play only to avoid a circumstance in which the publicly-financed candidates may be unfairly disadvantaged.

We find that it is unlikely that the plaintiff will succeed on the merits of their claim challenging the constitutionality of KRS 121A.030(5)(a).

## C. The $100/$500 Disparity

The plaintiffs raise two challenges with respect to KRS 121A.050(2) which limits the amount a privately-financed candidate may receive in contributions to $100 per person or entity per election.

First, the plaintiffs contend that the $100 limit is so low as to constitute a penalty for rejecting public financing. Second, the plaintiffs suggest that the disparity between the $100 limit for privately-financed candidates and the $500 limit for publicly-financed candidates (KRS 121A.050(1)) so greatly disadvantages the privately-financed candidate that it effectively precludes individuals from choosing private financing as an option for an effective campaign.

We find that there is a substantial likelihood that the plaintiffs will succeed on the merits of their claims challenging the constitutionality of the $100 contribution cap imposed upon privately-financed candidates.

In *Vote Choice,* 4 F.3d at 39–40, the court stated:

> The state need not be completely neutral on the matter of public financing of elections. When, as now, the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs "facilitate communication by candidates with the electorate," *Buckley,* 424 U.S. at 91, 96 S.Ct. at 669, free candidates from the pressures of fundraising, *see id.,* and, relatedly, tend to combat corruption. *See id.; see also RNC I,* 487 F.Supp. at 285–86. Establishing unequal contribution caps serves this multifaceted network of interests by making it more probable that candidates will choose to partake of public financing. Equally important, the gap appears to reflect a carefully calibrated legislative choice anent the differential risk of *quid pro quo* corruption in the two instances. In the state's view, the many eligibility requirements for public financing make it less likely that a given contribution will tend to corrupt a candidate. That view, too, is plausible. Ergo, the contribution cap gap stands on reasonably solid theoretical footing.
>
> For these reasons, we find Rhode Island's contribution cap gap narrowly tailored and logically related, in scope, size, and kind, to compelling governmental interests.

 As a general proposition then, a "cap gap," as the phrase has been coined by the First Circuit, is permissible in theory as

a weapon against *quid pro quo* corruption which may be engendered by sizeable agenda-laden contributions.

A cap gap is permissible in practice only if it is narrowly tailored to meet that compelling state interest. "There is a point at which the regulatory incentives stray beyond the pale, creating the disparities so profound that they become impermissibly coercive." *Vote Choice,* 4 F.3d at 38. We find that KRS 121A.050(2) establishes a contribution limit so low as to constitute a penalty imposed upon privately-financed candidates. The parties know of no state which imposes a contribution limit as low as $100 on any candidate with the exception of Kentucky's $100 limitation placed upon candidates running for school board. In Kentucky, candidates for all other public offices and publicly-funded candidates for governor are subject to a $500 contribution limit.

In *Day,* 34 F.3d at 1366, the United States Court of Appeals for the Eighth Circuit struck down a $100 contribution limit:

> An annual $100 limit on contributions to or by political funds and committees is too low to allow meaningful participation in protected political speech and association, and thus is not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system.

In 1987, Wilkinson spent $4.5 million in the Kentucky Governor's race. In recent history, the most conservative amount spent by a winning candidate for Governor was $2.4 million. Even with the constraints imposed by Kentucky's new election finance scheme, we find that a provision requiring privately-funded candidates to raise even a portion of its campaign war chest in $100 increments is palpably penal and thus not narrowly tailored to achieve the goal of thwarting *quid pro quo* corruption.

 We further find that the $100/$500 disparity between privately-financed and publicly-financed candidates' limits cannot be upheld as narrowly tailored to achieve its goal.

A distinction can be drawn between the $1,000/$2,000 disparity approved in *Buckley* and the $100/$500 disparity which faces us here. The Court in *Buckley,* 424 U.S. at 30, 96 S.Ct. at 640, quoting the opinion of the court of appeals, stated "If it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe whether, say, a $2,000 ceiling might not serve as well as $1,000." The Court then went on to state: "Such distinctions in degree become significant only when they can be said to amount to differences in kind." *Buckley,* at 30, 96 S.Ct. at 640.

The disparity here is 5 to 1. In actual application, the impact of the disparity is 15 to 1 since the publicly-financed candidate receives two publicly-funded dollars for each dollar he or she raises. We offer this 15-to-1 ratio as a comparison for illustrative purposes only. The plaintiffs do not challenge the 2-for-1 public benefit afforded public candidates. Therefore, they do not challenge that a publicly-financed candidate's dollars may be increased by two-thirds with public funds. We mention the 15-to-1 ratio, however, because the real impact of the disparity can only be determined in the context of the actual operation of the financing scheme as a whole. In reality, a privately-financed candidate may receive his contributions at most $100 at a time, while a publicly-funded candidate may receive as much as $1,500 per contribution.

In order to reach the $1.8 million total, a publicly-funded candidate need only reach 1,200 supporters providing $500 each. In order for a privately-funded candidate to achieve equipoise with his publicly-funded opponent, the privately-financed candidate must obtain $100 contributions from 18,000 supporters.

The defendants urged at oral argument that our calculus on this point is not realistic in light of historic facts. It is true that often in Kentucky's history there have been wealthy candidates in the governor's race who would not necessarily be required to obtain all their campaign funds through fundraising. However, we are evaluating the statute as it might impact any individual, wealthy or not, who may choose to use private financing for the campaign. We are looking to uncover and assess any inherent inequality to the candidates resulting from

the statutes' operation. Our assumption that both privately- and publicly-funded candidates will fundraise so as to achieve $1.8 million for their campaigns allows us to make an apples-to-apples comparison.

*Buckley* noted at 424 U.S. at 96, 96 S.Ct. at 671 that "Where, as here, a non-complying candidate suffers no more than a 'countervailing denial,' the statute does not go too far." The Kentucky statute imposes much more than a countervailing denial. The incentive, or "carrot," offered to publicly-financed candidates in this instance is, in practical application, a "stick" used upon privately-financed candidates.

We have been shown no case in which a disparity of greater than 2 to 1 was found to be narrowly tailored. We find the distinction in degree to be so great as to amount to an impermissible distinction in kind. The $100 limit is clearly not as narrowly tailored as it might be to address the compelling state interest in deterring *quid pro quo* corruption. The Kentucky legislature has said as much by finding that for all other state races a $500 limit is sufficient to accomplish the task. While there need not be absolute equality between the contribution limits, the disparity must not be so great as to "destroy the voluntariness of the public-financing system." *Vote Choice, Inc.,* 4 F.3d at 38.

We conclude, therefore, that the plaintiffs have shown a substantial likelihood of success on the merits in their challenge to the constitutionality of KRS 121A.050(2).

### D. The $50,000 Loan Limit

The plaintiffs challenge KRS 121.150(13) and (20) which (a) prohibit a slate of candidates from loaning its committee in excess of $50,000 in combined total personal loans, and (b) establish that any amount over the $50,000 limit provided by a slate of candidates or their immediate families is deemed a contribution and is not recoverable.

The parties agree that these provisions are targeted directly at *quid pro quo* corruption borne of campaign loan paybacks and clearly address the compelling government interest in avoiding the appearance of corruption.

The plaintiffs contend, however, that the $50,000 loan limit is not sufficiently narrowly tailored to pass constitutional muster. They urge that because other provisions in the campaign finance laws address the size of contributions (the $100/$500 provisions) and when they may be made (KRS 121.150(14) through (17) prohibit candidates from accepting contributions after the election), the $50,000 loan limit serves no purpose. They further urge that the provision impermissibly impinges upon the timing of a candidate's speech. They argue that a candidate may wish to speak early in the campaign and speak loudly, *i.e.,* intensively disseminate the campaign message—a course of action which would require a great deal of money. The candidate would be able to loan the campaign only $50,000 in order to engage in that early speech in the event that the campaign's fundraising efforts had not yet generated sufficient funds.

We do not find that the contribution limits and the prohibition on post-election contributions send the same message to the candidates and the public as the $50,000 loan limit. It is true that all these provisions target corruption and the appearance of corruption, but they accomplish the goal in different ways.

The contribution limits target the size of contributions, presumably based upon the theory that the smaller the contribution the less coercive it will be. The provision governing the timing of contributions diminishes the appearance that contributions that are made by supporters *after* the election foster a *quid pro quo* relationship. While post-election contributions may in actuality reimburse a candidate for loans made to the campaign, there is an impression that the contributor is lining the candidate's pocket, as there is no ongoing campaign to which the contribution may be made.

The $50,000 loan limit removes the appearance that heavily indebted candidates are easy bedfellows for *quid pro quo* contributors. Because they may not make loans in excess of $50,000 to their own campaigns, they cease to be personally financially vulnerable and therefore do not appear to be easy targets for corrupt contributors. We

find that this provision serves well this compelling state interest.

We do not find the $50,000 limit to be so low as to chill a candidate's early and loud speech. Candidates will, of course, be engaging in fundraising activities from the inception of their campaigns which will assist them in speaking early in the race. Further, it appears to this court that a $50,000 loan will buy a significant amount of speech (except on Super Bowl Sunday). In any event, since we do not find that the $50,000 limit chills speech and we do find that it achieves the narrow tailoring that is required, we must defer to the wisdom of the legislature with respect to the precise figure of $50,000.

We, therefore, determine that the plaintiffs are not likely to succeed on the merits in their challenge to the constitutionality of KRS 121.150(13) and (20).

### E. Anonymous Speech

The last challenge made by the plaintiffs is to KRS 121.190(1) and KRS 121.990(3)(d) which they contend prohibit anonymous political speech in the form of posters, circulars and handbills specifically (KRS 121.190(1)) and electoral communications generally (KRS 121.990(3)). The Registry interprets KRS 121.990(3)(d) as not broadening the scope of the prohibition on anonymous electoral communications beyond those communications delineated in KRS 121.190(1). The other defendants agree with the Registry's position on this point. Thus, our evaluation is limited to the claim that KRS 121.190(1) is unduly restrictive and overbroad in its inclusion of posters, circulars, and handbills in a listing of communications which must bear the identity of their payor.

The plaintiffs suggest that the decision of the United States Supreme Court upon review of *McIntyre v. Ohio Elections Commission*, 67 Ohio St.3d 391, 618 N.E.2d 152 (1993), will be dispositive of their claim. The Supreme Court granted certiorari in the case on February 22, 1994, and arguments were heard on October 12, 1994. The defendants agree that the decision may provide guidance to the court, but they disagree that it will be dispositive of the issue.

The plaintiffs seek an injunction prohibiting enforcement of the identification provision until the Supreme Court renders its decision in *McIntyre*. They urge that it would be best for the court to err on the side of protecting First Amendment freedoms by affording plaintiff Weaver the opportunity to engage in anonymous speech until the Supreme Court rules. We see of no reason to depart from the customary considerations in assessing the propriety of issuing injunctive relief.

In analyzing the likelihood of success on the merits, we would note that the decision of the Supreme Court of Ohio in *McIntyre*, while interesting, presented a somewhat different scenario. The communications in question related to a ballot issue. The statute barring anonymous leafleting which was implicated in the case contained very broad language. It may be roughly paraphrased as covering any writing, printing, posting, or distributing of notices or any other form of general publication which is designed to promote or defeat any issue.

In *McIntyre*, the Ohio Supreme Court quoted from the decision of *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), that "Election laws will invariably impose some burden upon individual voters." The court distinguished the Ohio statute before it from the one at issue in *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) which struck down a city ordinance requiring every handbill to display the name and address of its author. The Supreme Court in *Talley* rejected the contention that the ordinance was "aimed at providing a way to identify those responsible for fraud, false advertising and libel." The Court stated that "the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose." *Talley*, at 64, 80 S.Ct. at 538.

In distinguishing the Ohio statute from the one addressed in *Talley*, the Ohio Supreme Court stated:

> In contrast to the ordinance at issue in *Talley*, appellees can legitimately claim that R.C. 3599.09 has as its purpose the identification of persons who distribute

materials containing false statements.... The minor requirement imposed by R.C. 3599.09 that those persons producing campaign literature identify themselves as the source thereof neither impacts the content of their message nor significantly burdens their ability to have it disseminated. This burden is more than counterbalanced by the state interest in providing the voters to whom the message is directed with a mechanism by which they may better evaluate its validity. Moreover, the law serves to identify those who engage in fraud, libel or false advertising. Not only are such interests sufficient to overcome the minor burden placed upon such persons, these interests were specifically acknowledged in [*First National Bank of Boston v.*] *Bellotti,* [435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)] to be regulations of the sort which would survive constitutional scrutiny.

*McIntyre,* 618 N.E.2d at 154–55.

■ The identification requirement in Kentucky's statutes is limited to identifying the financial resources for the communication. The statute requires that the communication contain the language "paid for by" and the name and address of the payor sponsoring a television ad, newspaper ad, poster, billboard, circular, handbill—all of which cost money. Identification of the source of those funds is all that KRS 121.190(1) accomplishes. The Kentucky statute is, therefore, much narrower than the Ohio statute at issue in *McIntyre.*

The compelling state interests which the Kentucky provisions address were enumerated and approved by the United States Supreme Court in *Buckley,* 424 U.S. at 67–68, 96 S.Ct. at 657–58:

The governmental interests sought to be vindicated by the disclosure requirements ... fall into three categories. First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.... Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.... Third, and not least significant, recordkeeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

The identification provision is narrowly tailored to meet these compelling state interests inasmuch as they only require identification of the payor. The sponsorship of speech can properly be subject to disclosure when the speech is directed toward or intended for the support or defeat of a candidate, slate of candidates, or group of candidates for nomination or election to any public office.

We find that the plaintiffs do not have a likelihood of success on the merits in their challenge to the constitutionality of KRS 121.190(1).

## VI. INJURY TO OTHERS AND THE PUBLIC INTEREST

We have determined that a constitutional infringement causes irreparable injury. We have found a substantial likelihood of success on the merits with respect to the plaintiffs' claim that the $100 contribution limit imposed upon privately-financed candidates by KRS 121A.050(2) is unconstitutional.

When KRS 121A.050(2) was passed by the legislature, the bill included a provision which provided:

If the provisions of subsection (2) of Section 5 of this Act are declared unconstitutional, the maximum contribution which may be made to or received by a slate of candidates that has filed a statement of intent to reject transfers from the fund and not abide by the maximum expenditure limit or a slate that has rescended [*sic*] a statement of intent to accept transfers from the fund shall be five hundred dollars ($500) in any one (1) election.

Section 64 of Acts, 1992, ch. 288. (This provision appears in the Compiler's Notes to 121A.050.)

■ Should this court enter an injunction prohibiting enforcement of 121A.050(2), the $500 contribution limit would apply to all

candidates. This change would not affect publicly-financed candidates who are already operating under the $500 limitation of subsection (1). It is also early enough in the campaign process that it will not throw an established campaign off balance. We are not persuaded by the argument that this substantially changes the ground rules upon which certain candidates based their decision to accept public financing. Privately-financed candidates are still able to expend unlimited amounts. They may raise it in larger sums. At most, this will intensify the debate on the issues at an earlier stage in the campaign.

█ We find that an injunction would serve the public interest. Removing the $100 limitation on privately-financed candidates furthers the objective of fostering greater debate of the issues among differently financed candidates. The public interest in the avoidance of corruption or the appearance of corruption in campaigns is preserved because the issuance of the injunction will not remove all contribution limits.

For the reasons articulated herein, we will issue an injunction prohibiting the enforcement of KRS 121A.050(2) to the extent that it limits contributions to privately-financed slates of candidates to a total of $100 per person or entity per election.

In all other respects, the motion for preliminary injunction will be denied. A separate document so ordering will be entered herein this date.

### PRELIMINARY INJUNCTION

The plaintiffs, Wallace G. Wilkinson and Russell C. Weaver, having moved for issuance of a preliminary injunction pursuant to Federal Rules of Civil Procedure 65, and the court having heard argument of counsel and having considered the memoranda of the parties, and for the reasons set forth in the memorandum opinion entered herein this date,

**IT IS HEREBY ORDERED** this 27th day of January, 1995 at 10:55 A.M. E.S.T., that:

The defendants, Brereton C. Jones, in his official capacity as Governor of the Commonwealth of Kentucky; Chris F. Gorman, in his official capacity as Attorney General of the Commonwealth of Kentucky; Kentucky Registry of Election Finance; Joe Terry, in his official capacity as Chair of the Kentucky Registry of Election Finance; Nicholas N. King, in his official capacity as Jefferson County Commonwealth Attorney; and Michael E. Conliffe, in his official capacity as Jefferson County Attorney, and their respective officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise (collectively referred to as "defendants" for purposes of this order), be, and they hereby are **ENJOINED** from enforcing Kentucky Revised Statute 121A.050(2) to the extent that it imposes a contribution limit of less than $500 on privately-financed candidates.

Pursuant to Fed.R.Civ.P. 65(c), this injunction is conditioned upon the posting of a bond by the plaintiffs in the amount of one dollar ($1).

Pursuant to Fed.R.Civ.P. 54(b), and there being no just reason for delay in its entry, this is a final order.

### ORDER

Except to the extent that a preliminary injunction has been ordered herein separately on this date, the motion of the plaintiffs for a preliminary injunction may be and is hereby **DENIED.**

**IT IS SO ORDERED.**