_____

No. 95-1885
_____

Patrick Rosenstiel; Christopher *
Longley,                        *
                                *
        Plaintiffs-Appellants,*     Appeal from the United States
                                *     District Court for the
    v.                          *     District of Minnesota.
                                *
Carolyn Rodriguez, in her       *
capacity as Chair of the Ethical*
Practices Board, or her         *
successor,                      *
                                *
        Defendant-Appellee.   *


_____

Submitted:  November 15, 1995

Filed:  December 11, 1996
_____

Before HANSEN, LAY, and MURPHY, Circuit Judges.
_____


HANSEN, Circuit Judge.


        Patrick Rosenstiel and Christopher Longley appeal a final judgment of the district court[1] upholding the constitutionality of Minnesota's campaign finance statutes.  Rosenstiel and Longley seek a declaration that several provisions of the law are unconstitutional because they allegedly coerce a candidate into participating in Minnesota's public campaign financing program, thereby burdening that candidate's First Amendment rights.  They further maintain that the provisions are constitutionally infirm

_____

        [1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

because they do not survive strict scrutiny. Finally, they contend that these provisions impermissibly discriminate against challengers. After conducting a careful review, including an amendment to the statute which the Minnesota legislature enacted after we heard oral arguments, we affirm.

I.

The State of Minnesota (State) has enacted a campaign financing system which permits candidates for certain elected state offices to receive a public subsidy in exchange for the candidate's agreement to adhere to specified limits on campaign expenditures. Minn. Stat. Ann. §§ 10A.25 (10)(a), 10A.322(1)(a) (West Supp. 1997). A candidate must sign an agreement to be bound to the applicable campaign expenditure limits in order to receive the public subsidy. Id. § 10A.322(1)(a). The participating candidate must also independently raise a certain amount ($35,000 for governor down to $1,500 for state representative) in contributions in order to be eligible for the public subsidy. Id. § 10A.323. A Minnesota taxpayer can claim a full refund of up to $50 per year (or $100 for a couple filing jointly) for a campaign contribution made to a publicly funded candidate; however, no refund is permitted for a campaign contribution made to a candidate who is not publicly funded. Id. § 290.06(23) (hereinafter referred to as "contribution refund").[2]

The expenditure limitations for each public office to which the State's campaign financing scheme applies are delineated in

_____

[2]To clarify, however, this is the total dollar amount which may be claimed as a refund in a calendar year for a contribution or contributions made to candidates participating in the State's scheme. In other words, although an individual may have made contributions to participating candidates in a calendar year totaling $500, that individual may only claim a $50 refund for that year.

section 10A.25(2)(a), and range from $1,626,691 for a gubernatorial candidate down to $20,335 for a candidate for state representative. The amount of public subsidy available to a candidate who is running for an office to which the State's financing scheme applies is determined by way of formula. Id. § 10A.31(5). However, the amount of public subsidy the candidate receives may not exceed 50 percent of the expenditure limits applicable to the office which the candidate seeks. Id. § 10A.31(7). A candidate who has agreed to adhere to the expenditure limits but later accepts campaign contributions or makes campaign expenditures in excess of those limits is subject to a civil fine of up to four times the amount by which the contribution or expenditure exceeded the limit. Id. § 10A.28(1).

Prior to an amendment in April 1996, the above expenditure limits were only applicable to a candidate if the candidate's major-party opponent likewise agreed to be bound by the expenditure limits. Id. § 10A.25(10) (West Supp. 1996) (repealed). Thus, when a publicly financed candidate was opposed by a nonparticipating major party candidate, the publicly financed candidate was no longer required to adhere to the specified expenditure limits for his office but was still eligible to receive the public subsidy. Id. § 10A.25(10)(b)(i)-(ii) (West Supp. 1996) (repealed) (hereinafter referred to as "expenditure limitation waiver").

In 1994, Appellants Rosenstiel and Longley (Appellants) were candidates for different seats in the Minnesota House of Representatives. Both enrolled in the State's public campaign funding program. They later filed this action on August 19, 1994, alleging that the expenditure limitation waiver and the contribution refund violated their First Amendment rights. Both claimed by way of affidavit that they believed they could privately raise campaign funds in excess of the law's expenditure limits which they had agreed to observe. They subsequently moved for a

-3-

preliminary injunction, seeking to enjoin the enforcement of these provisions. The district court denied injunctive relief but noted that the Appellants had proffered sufficient evidence to demonstrate that they were likely to prevail on their claim that the contribution refund was unconstitutional.

The Appellants later moved for summary judgment. The district court held that the expenditure limitation waiver and the contribution refund passed constitutional muster, denied Appellants' motion for summary judgment, and accordingly dismissed their complaint.[3] Rosenstiel and Longley appealed.[4]

After this case was submitted to us, an amendment passed by the Minnesota legislature altering the operation of the expenditure limitation waiver became effective. See Act of April 11, 1996, ch. 459 (S.F. 840), amending Minn. Stat. Ann. § 10A.25(10) (West. Supp. 1996). Under the amendment, a candidate participating in the State's public financing of campaigns is not released from the expenditure limitation simply by virtue of being opposed by a

_____

[3]Additionally, the district court declared unconstitutional an additional provision the Appellants challenged, Minn. Stat. § 10A.25(10)(b)(iii) (West Supp. 1996). This provision provided that when a publicly funded candidate faces a major party candidate who does not enroll in the State's public funding program, the publicly funded candidate also is eligible to receive all or part of the subsidy which was set aside for his opponent. Although the Appellants repeatedly attack the constitutionality of this provision in their brief, the State has not appealed the district court's ruling that this provision is unconstitutional. Accordingly, its validity is not before us, and we decline to discuss it further, except to observe that the Act of April 11, 1996, repealed the provision.

[4]Although neither Appellant was successful in his quest for public office, both claim that they harbor future political aspirations and intend to run for state office. Thus, this case is not moot because it involves issues which are "capable of repetition, yet evading review." Moore v. Ogilvie, 394 U.S. 814, 816 (1969) (internal quotations omitted); see also Whitton v. City of Gladstone, 54 F.3d 1400, 1402 n.5 (8th Cir. 1995) (same).

-4-

nonparticipating, major-party candidate. Rather, when a participating candidate squares off against any nonparticipating candidate, the participant is released from the expenditure limit when the opponent receives contributions or makes expenditures equalling 20 percent of the applicable limit prior to 10 days before the primary election, and contributions or expenditures equalling 50 percent of the applicable limit thereafter. Minn. Stat. Ann. § 10A.25(10)(a)(1)-(2) (West. Supp. 1997).

The amendment thus makes several changes to the mechanics of the expenditure limitation waiver. First, the expenditure limitation waiver comes into play when any nonparticipating opponent engages in the triggering event, i.e., receives contributions or makes expenditures in excess of the specified threshold, whereas before, the triggering act had to be done by a nonparticipating major-party opponent. Second, and more importantly, the triggering event itself occurs when any nonparticipating opponent reaches the specified threshold in campaign contributions or expenditures. Previously, the triggering event was simply the major party opponent's decision not to participate in the State's public campaign financing. In other words, the amendment eschews an automatic waiver to participating candidates at the moment their major party nonparticipating opponent declines to enroll, in favor of a wait-and-see approach based on actual contributions to or expenditures made by any nonparticipating opponent.

At the direction of this court, the parties submitted letter briefs concerning the effect, if any, the amendment had on the issues presented in this case, and whether remand to the district court for further proceedings was necessary. Both sides strenuously contend that a remand is unnecessary. Concerning the merits of the amendment, the Appellants assail its validity primarily on the same grounds they contested the former language,

-5-

i.e, that it coerces candidates to participate, and it is not narrowly tailored to further a compelling governmental interest. The State, on the other hand, contends that, even assuming the prior expenditure limitation waiver coerced compliance, the amended statute is not coercive because the nonparticipating candidate solely determines whether to trigger the expenditure limitation waiver for the publicly-financed candidate by receiving contributions or making expenditures in excess of the applicable threshold. Alternatively, the State maintains that, like the former language, the amendment is narrowly tailored to serve a compelling governmental interest.

## II.

It is clear that we must review the judgment appealed from in the light of the Minnesota statute as it now stands, not as it stood when the judgment below was entered. Fusari v. Steinberg, 419 U.S. 379, 387 (1975); Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414 (1972). Whether the amendment so changes the nature of the dispute before us so as to make the appeal moot is a close question.

The Supreme Court has held that where a new statute "is sufficiently similar to the repealed [statute] that it is permissible to say that the challenged conduct continues" the controversy is not mooted by the change, and a federal court continues to have jurisdiction. Northeastern Fla. Chapter v. City of Jacksonville, 508 U.S. 656, 662 n.3 (1993). Further, if the new statute disadvantages the complainants in the same fundamental way the repealed statute did, the amendment does not divest the court of the power to decide the case. Id. at 662. Here, the amendment relates only to one subdivision of the whole larger statutory scheme assailed by the Appellants' complaint. It repealed only one of the five specific sections plaintiffs attacked and replaced it

with language that still permits a waiver of the expenditure limitations while remaining eligible for the public subsidy. Essentially the amendment changes the triggering event necessary to bring the spending limits waiver into play and, accordingly, the point in the campaign when the spending limits are removed from a participating candidate. These changes are not insignificant at least as far as the actual operation of the statute is concerned. On the other hand, with respect to its effect, the amended statute still impairs the Appellants in the very same way that they claimed the prior section did. In the Appellants' view, the amendment broadens the coverage of the law (by applying it to any opponent of a participating candidate rather than just a major-party opponent) and is more, not less, coercive than the repealed subdivision. (Appellants' Letter Br. at 2, June 14, 1996.) We believe that the fundamental nature of the challenged statute continues unchanged. The challenged conduct (the waiver of the spending limits) continues to exist under the new language of § 10A.25(10). The public subsidy and the tax refund provisions are unchanged. We do not believe that the controversy upon which the district court rendered its judgment is substantially different from the one presented to us by the amended statute. Accordingly, we hold the case is not moot.

### III.

Because the Appellants' claims require us to evaluate the constitutionality of the challenged provisions, our review is de novo. <u>Falls v. Nesbitt</u>, 966 F.2d 375, 377 (8th Cir. 1992).

### A.

The Appellants contend that the expenditure limitation waiver and the contribution refund cause the State's campaign financing system to infringe upon the First Amendment rights of the

candidates for political offices to which the plan applies. "When considering whether a campaign finance law unconstitutionally infringes freedom of speech, this Court's task is to decide whether the provision in question actually `burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest.'" Shrink Mo. Gov't PAC v. Maupin, 71 F.3d 1422, 1424 (8th Cir. 1995) (quoting Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 657 (1990)), cert. denied, 116 S. Ct. 2579 (1996). Our first task, then, is to determine whether the challenged provisions impose any burden at all on the First Amendment rights of candidates.

In Buckley v. Valeo, 424 U.S. 1, 85-109 (1976), the Supreme Court held that while the imposition of a mandatory limit on campaign expenditures violated a candidate's First Amendment rights, a voluntary system under which candidates agreed to limit campaign expenditures in exchange for public financing of their campaigns was constitutionally permissible. Specifically with regard to this point the Court stated:

> Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.

Id. at 57 n.65. See also Colorado Republican Fed. Campaign Comm. v. FEC, 116 S. Ct. 2309 (1996) (plurality opinion) (political party independent expenditure provision inconsistent with First Amendment).

Such a system of public financing of political campaigns was expressly approved in Republican Nat'l Comm. v. FEC, 487 F. Supp. 280, 283-86 (S.D.N.Y.) (three-judge court), aff'd mem., 445 U.S. 955 (1980) (RNC). In RNC, the plaintiffs challenged a federal law

which provided $20,000,000 in public funding to presidential candidates who agreed to limit campaign expenditures to that amount. Id. at 283. The court held that this scheme did not burden a candidate's First Amendment rights because it simply provided an additional option for accumulating campaign funds. Id. at 285. "Each candidate remains free under the Fund Act, instead of opting for public funding, to attempt through private funding to raise more than the `$20,000,000 plus' public funding limit and to spend any amount of funds raised by private funding, without any ceiling." Id. at 283-84. The Court observed that each candidate would presumably select the method for raising campaign funds that he thought to be most advantageous. Id. at 285. Accordingly, the court ruled that this choice-increasing framework imposed no burden on a candidate's First Amendment rights. Id.

The Appellants contend that the State's public financing scheme is distinguishable from that referred to in Buckley and expressly approved in RNC. Specifically, the Appellants argue that the expenditure limitation waiver, Minn. Stat. Ann. § 10A.25(10), and the contribution refund, Minn. Stat. Ann. § 290.06(23), are coercive because they create such a large disparity between the benefits provided to publicly financed candidates and the corresponding restrictions imposed on those candidates. Stated otherwise, the Appellants contend that these provisions make the public financing option so attractive that they effectively compel candidates to enroll in the State's financing plan. This compelled participation, continue the Appellants, is a burden on their First Amendment rights. The State counters by arguing that the expenditure limitation waiver and the contribution refund are simply additional inducements provided to encourage maximum candidate participation in its public financing of political campaigns and that the inclusion of these inducements gives the campaign financing plan a relative balance in terms of benefits provided to participating candidates and the restrictions imposed

-9-

on those candidates.  Because participation is truly voluntary, the State submits, the Appellants' argument that their First Amendment rights are burdened is without merit.  We agree with the State.

The First Circuit addressed similar arguments concerning a Rhode Island financing scheme in Vote Choice, Inc. v. DiStefano, 4 F.3d 26 (1st Cir. 1993).  In Vote Choice, in an effort to make its public financing scheme for gubernatorial candidates more attractive, Rhode Island permitted participating candidates, in addition to receiving a public subsidy, to receive campaign contributions from individuals or PACs of up to $2,000 per year, while candidates who eschewed public financing were allowed to receive only $1,000 per year from those donors (what the Vote Choice court referred to as a "cap gap").  Id. at 30.[5]  The Vote Choice plaintiff/candidate claimed that the cap gap caused Rhode Island's scheme to become coercive, thereby burdening a candidate's First Amendment rights.  Like the Appellants here, the essence of the Vote Choice plaintiff/candidate's claim was that by providing incentives beyond a cash subsidy to publicly financed candidates, Rhode Island's scheme was so benefit-laden that gubernatorial candidates were really offered no alternative but to enroll.  Id. at 38.

The Vote Choice court disagreed.  The court noted that there was nothing inherently penal about the cap gap and accordingly

_____

[5]Rhode Island's scheme also possessed several other features which are similar or identical to the State's scheme before us. For candidates that opted for public financing, Rhode Island matched contributions the candidate raised through private means up to a certain specified amount.  Id. at 30.  Additionally, a publicly financed candidate was permitted to exceed the expenditure limits and retain the public subsidy if opposed by a privately financed candidate who exceeded the expenditure limit in either campaign contributions or expenditures.  Id. at 30 n.5. However, the Vote Choice plaintiff/candidate did not challenge either of these aspects of Rhode Island's scheme and thus the court did not assess their validity.

-10-

rejected the plaintiff/candidate's contention that Rhode Island's scheme was per se coercive because it sought to punish non-participants rather than simply reward participants. Id. The court then ruled that the enactment of the cap gap did not make the incentives in Rhode Island's scheme so strong that candidates were coerced into participating; the court noted that, with the cap gap, the scheme achieved a relative balance between advantages afforded to, and restrictions placed on, publicly financed candidates. Id. at 38-39. In sum, Rhode Island created a campaign financing option which increased a candidate's choice concerning methods for raising campaign funds, participation in this program was truly voluntary, and thus the plaintiff-candidate's claim of coerced participation was without merit. Id. at 39. See also Wilkinson v. Jones, 876 F. Supp. 916, 926-28 (W.D. Ky. 1995) (Kentucky scheme permitting publicly financed candidate to disregard expenditure limit and continue receiving state matching funds when privately financed opponent exceeded that amount was not coercive and thus imposed no burden on candidate's First Amendment rights).

We find the analysis from Vote Choice provides helpful guidance in resolving the Appellant's claim that Minnesota's scheme is coercive. Like the Rhode Island public financing scheme challenged in Vote Choice, the State's scheme in this case provides certain inducements -- the expenditure limitation waiver and the contribution refund in addition to a public cash subsidy -- in order to encourage maximum candidate participation. These inducements, however, do not per se render the State's scheme coercive because they are not inherently penal.

Further, the inclusion of these additional inducements in the State's public financing package does not cause the package to become so benefit-laden as to create such a large disparity between benefits and restrictions that candidates are coerced to publicly finance their campaigns. Rather, by including these additional

-11-

inducements, the State's scheme achieves a relative balance between the benefits provided to publicly financed candidates and the restrictions the candidates must accept. The expenditure limitation waiver, which permits a publicly financed candidate to exceed the expenditure limits while retaining the public subsidy when opposed by a nonparticipating candidate who has spent or received contributions beyond the triggering amounts spelled out in the statute is simply an attempt by the State to avert a powerful disincentive for participation in its public financing scheme: namely, a concern of being grossly outspent by a privately financed opponent with no expenditure limit.

We believe the statute is not coercive because it permits the nonparticipating candidate to raise a certain measure of funds before triggering the expenditure limitation waiver for his participating opponent. Rather than releasing the participating candidate from the expenditure limits at the outset, the statute as it now stands permits the nonparticipating candidate to control whether and when the participating opponent will be freed from the limits. Thus, in a sense, the amendment works in favor of, rather than to the detriment of, the nonparticipating candidate. See Wilkinson, 876 F. Supp. at 927 (rejecting claim of coercion to enroll in state public financing scheme because privately-financed candidate completely controlled the triggering event by exceeding the threshold in campaign funds or expenditures).[6] Similarly, the

_____

[6]We point out, only as an illustration of how the statute actually works to the benefit of nonparticipants and thus cannot be construed to "coerce" enrollment, that it is possible that under certain circumstances the amendment could be employed to work to the substantial disadvantage of participants. This disadvantage arises from the temporal impediment a participating candidate faces before he is released from the expenditure limits; that is, he is only released when his opponent triggers the waiver. Specifically, if a nonparticipating candidate waited until the final days before an election to exceed the triggering limits, and then waged an all-out campaign blitz, the publicly-financed candidate, who is not released from the limits until his

contribution refund, which permits a Minnesota citizen to obtain a refund of up to a total of $50 per year for contributions made to publicly financed candidates, is simply an additional public subsidy provided to participating candidates.  See Buckley, 424 U.S. at 107 n.146; Regan v. Taxation with Representation of Washington, 461 U.S. 540, 544 (1983) (tax credits and deductibility for contributions are a form of government subsidy to the entity or activity to which the contributions are made).  While the scheme's benefit-restriction ratio is not, to borrow from the Vote Choice court, in "perfect equipoise," see 4 F.3d at 39, we are convinced that it achieves the rough proportionality necessary to entice, but not coerce, candidate participation.

The Appellants argue that the legislative history underlying the State's public financing system and a prior statement of this court illustrate that the scheme was devised to compel candidate participation.  Specifically, Senator John Marty of Roseville, Minnesota, a chief proponent of the public financing scheme, stated that it was to operate "as a real heavy club," ostensibly meaning to force candidate participation.  Weber v. Heaney, 995 F.2d 872, 877 n.7 (8th Cir. 1993) (quoting Minnesota Congressional Campaign Reform Act, 1990: Hearing on S. 577 before the Subcommittee on Elections and Ethics, 76th Legis. (Mar. 1, 1989) (statement of Senator Marty)).  Further, in Weber, after holding that the Minnesota Congressional Campaign Reform Act (MCCRA) was preempted by the Federal Election Campaign Act (FECA), we examined Senator

---

opponent triggers the waiver, potentially would not have sufficient time to raise enough campaign funds to effectively counter his opponent's campaign blitz.  Obviously, such a sequence of events could be particularly harmful to the publicly-financed candidate's chances of electoral success.  In any event, we simply offer this example to illustrate that because the privately-financed candidate alone determines whether the publicly-financed candidate will be permitted to exceed the limits, it cannot seriously be argued that the State's scheme coerces candidate participation.

Marty's statement in a footnote, noting that it was debatable whether participation in the State's public funding scheme was truly voluntary. 995 F.2d 872, 877 n.7 (8th Cir. 1993). Specifically, we stated:

> We also question whether the limitations are truly voluntary. Contributors may receive a refund from the state when they contribute to a candidate who has agreed to limit campaign expenditures, which will enhance that candidate's fund raising ability. If a candidate agrees to limit expenditures and then does not abide by the limits, the candidate suffers substantial penalties. Additionally, candidates who do not agree to be bound by the spending limits are penalized because their opponents who have agreed to the limits will still receive public financing, but will not be bound by their agreement. The Minnesota law is not a carrot enticing candidates to comply; as a proponent of the bill boasted, it is "a real heavy club." Minnesota Congressional Campaign Reform Act, 1990: Hearing on S. 577 before the Subcommittee on Elections and Ethics, 76th Legis. (Mar. 1, 1989) (statement of Senator Marty).

Id. The Appellants contend that, based on the above quotation, we are bound by principles of stare decisis to hold that the challenged provisions here are coercive and, in any event, Senator Marty's statement is definitive proof that the Minnesota legislature sought to compel candidate participation.

We believe that the Appellants lean too hard on Senator Marty's statement as well as the footnote in Weber. Significantly, it appears that Senator Marty's statements were made in the 1990 Minnesota legislative session during debate surrounding the MCCRA, not with respect to the provisions at issue in this case; the Appellants have made no showing, other than a bare assertion, that the statements were intended to apply to the provisions they challenge here. Furthermore, an isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body: in the absence of a showing that a more significant segment of the Minnesota

-14-

legislature shared Senator Marty's views, we are not inclined to conclude that his statements accurately reflect the legislative purpose underlying the State's public financing scheme. See United States v. O'Brien, 391 U.S. 367, 383-84 (1968) (when determining constitutionality of a statute, it would be improper to decide its fate "on the basis of what fewer than a handful of Congressmen said about it.").

With respect to footnote 7 in Weber, we prefaced our comments with "We also question . . .," clearly illustrating that our subsequent statements were little more than observations about the Minnesota scheme. Indeed, earlier in the same footnote we stated, "Whether the expenditure limitations under Minnesota law are voluntary is irrelevant when considering whether the state law is preempted." Id. Thus, the voluntariness of the MCCRA was tangential to the central holding of the case: that the MCCRA was preempted by FECA. As such, these statements are obiter dicta. Weber left to another day the detailed analysis of the First Amendment implications of the Minnesota scheme. "The district court held that the First Amendment was not violated by the expenditure limitations in [MCCRA]. That issue is not before us." Id. at 876 n.6. Further, in contrast to the statute at issue in Weber, the present statute does not permit participating candidates to toss off the expenditure limits just because their opponent declines to participate. It is the nonpublicly-funded opponent's conduct in raising money or spending it in excess of the statutory threshold amounts that triggers the limitations waiver for the participating candidate. Weber, therefore, does not dictate a conclusion that the provisions here are coercive and violate the First Amendment.

In sum, the State has created a public financing scheme for certain elected offices which is available to candidates who meet certain threshold qualifications. This scheme presents candidates

-15-

with an additional, optional campaign funding choice, the participation in which is voluntary. Under this choice-increasing framework, candidates will presumably select the option that they feel is most advantageous to their candidacy. Given this backdrop, it appears to us that the State's scheme promotes, rather than detracts from, cherished First Amendment values. See Vote Choice, 4 F.3d at 39; see Wilkinson, 876 F. Supp. at 926-28. See also RNC, 487 F. Supp. at 285. Accordingly, we reject the Appellants' claim that the challenged provisions create a coercive public financing scheme that burdens a candidate's First Amendment rights.[7]

B.

Our conclusion that the challenged provisions do not burden a candidate's First Amendment rights is a sufficient basis on which to affirm the judgment of the district court. However, even if we assume that the State's scheme does burden a candidate's First Amendment rights to some degree, the scheme generally, and the challenged provisions specifically, are still constitutionally

---

[7]We also disagree with the Appellants' argument that in order to make participation in a public funding scheme truly voluntary, the governmental entity must provide more funding to the publicly funded candidate than the candidate could raise through private means. Aside from the fact that it would be an exercise in pure speculation to determine the amount a given candidate for a particular office could raise in a campaign, the public financing cases have imposed no such requirement. Cf. RNC, 487 F. Supp. at 285 (rejecting argument that public financing scheme was coercive because it offered more public funds than the candidate claimed he could privately raise). This claim is also undermined by evidence in the record illustrating that the average publicly financed campaign for a state senate or house of representatives seat spends only approximately 2/3 of the amount permitted by the applicable expenditure limit. Thus, most publicly financed candidates do not make campaign expenditures which even approach the applicable expenditure limits. We accordingly decline to further address this somewhat unorthodox argument.

permissible because they survive strict scrutiny; that is, they are narrowly drawn to serve a compelling governmental interest.[8]

A campaign finance law which burdens protected speech will be upheld if the governmental entity can show that it furthers a compelling governmental interest and is narrowly drawn to serve that interest.  Shrink Mo., 71 F.3d at 1426; see also RNC, 487 F. Supp. at 285 ("Where compelling governmental interests exist, Congress' power to place reasonable conditions upon expenditures of public funds, even where they affect the exercise of First Amendment rights, has been recognized.").  In this case, the State seeks to promote a reduction in the possibility for corruption that may arise from large campaign contributions and a diminution in the time candidates spend raising campaign contributions, thereby increasing the time available for discussion of the issues and campaigning.  It is well settled that these governmental interests are compelling.  See Shrink Mo., 71 F.3d at 1426 ("the state's interest in reducing corruption and its related concerns constitute a compelling state interest"); RNC, 487 F. Supp. at 285 (curbing possibility of corruption from large campaign contributions and reducing candidate time spent raising campaign funds are compelling interests); see also Carver, 72 F.3d at 638 (8th Cir. 1995) (noting that Buckley held that limiting the reality or perception of corruption due to large campaign contributions was compelling interest).  Indeed, given the importance of these interests, the

_____

[8]The State contends that we should apply the intermediate level of scrutiny articulated in United States v. O'Brien, 391 U.S. 367, 377 (1968), rather than strict scrutiny, to the refund provision.  Seizing upon an excerpt from Buckley, the State contends that the Supreme Court indicated that a lower level of scrutiny applies in evaluating governmental regulations involving campaign contributions.  (See State's Br. at 40.)  However, we recently held, after carefully reviewing Buckley, that strict scrutiny is the appropriate standard for analyzing regulations of campaign contributions.  Carver v. Nixon, 72 F.3d 633, 637-38 (8th Cir. 1995), cert. denied, 116 S. Ct. 2579 (1996).

-17-

State has a compelling interest in stimulating candidate participation in its public financing scheme. Vote Choice, 4 F.3d at 39; see also Wilkinson, 876 F. Supp. at 928 ("Kentucky has a compelling interest in encouraging candidates to accept public financing and its accompanying limitations which are designed to promote political dialogue among the candidates and combat corruption by reducing candidates' reliance on fundraising efforts.").

Thus, the constitutional validity of the State's scheme turns on whether the challenged provisions are narrowly tailored to serve these interests. We believe that each of the challenged provisions satisfies this test. Initially, we observe that the State's basic public financing program of providing a public subsidy in exchange for the candidate's agreement to abide by expenditure limits is consistent with campaign financing plans which courts have long held satisfy strict scrutiny. See RNC, 487 F. Supp. at 285-87; Vote Choice, 4 F.3d at 39-40.

The expenditure limitation waiver also satisfies strict scrutiny. As we noted above, this provision removes the disincentive a candidate may have to participate in the public financing system because of the candidate's fear of being grossly outspent by a well-financed, privately funded opponent. Absent such a safeguard, the State could reasonably believe that far fewer candidates would enroll in its campaign financing program, with its binding limitation on campaign expenditures, because of the candidates' concerns of placing their candidacy at an insurmountable disadvantage.[9] The State simply sought to alleviate

---

[9]This is especially true in a system like Minnesota's, in which the publicly financed candidate will receive a public subsidy of no more than 50 percent of the expenditure limits. Thus, the candidates, even if publicly funded, still have certain private fund raising needs.

-18-

this concern by permitting the candidate who enrolled in public financing to disregard the expenditure limits if his opponent does not limit campaign spending.  Finally, by allowing the publicly financed candidate to retain the public subsidy, the State simply seeks to reward those who agreed to limit campaign expenditures and do so until their opponent has received or spent private money equal to what the maximum direct state subsidy is.  Accordingly, we have little difficulty concluding that the expenditure limitations waiver is narrowly tailored to serve the State's interests.  See Wilkinson, 876 F. Supp. at 928 (holding similar provision narrowly tailored to serve compelling governmental interest).  See also Vote Choice, 4 F.3d at 39 (holding cap gap, which increased likelihood of participation in public funding scheme, narrowly tailored to serve compelling governmental interest).

We likewise conclude that the contribution refund is narrowly tailored to serve the State's interests.  As we noted above, it is in substance a public subsidy provided to the participating candidate, the amount of which is directly related to the measure of popular support enjoyed by that candidate.  Such a system has previously been upheld.  See Bang v. Chase, 442 F. Supp. 758, 766

---

Indeed, the Appellants seem to have acknowledged as much in their memorandum in support of their motion for summary judgment, where they stated that the expenditure limitation waiver

> might be seen as simply an attempt to protect those who agree to limits.  If the limits stayed on no matter what level of spending the opponent engaged in, those who agreed to limits would be at a severe competitive disadvantage in those cases.  Candidates who agreed to limit spending would soon be eliminated by the equivalent of natural selection.  The legislature could reasonably have concluded that both of these features were essential to give the new system of spending limits a fair chance to succeed.

(Appellants' Addend. at 32 (quoting Appellants' mem. in supp. of mot. for summ. j. at 9).)

(D. Minn. 1977) (three-judge court) (holding valid a Minnesota tax checkoff system for political party which tied amount of subsidy to measure of popular support), aff'd, 436 U.S. 941 (1978). The State reasonably could conclude that this additional form of public subsidy will encourage candidate participation because candidates will believe that they will be able to draw campaign contributions from a broader array of the citizenry when citizens are informed that they may obtain a refund of up to $50 for contributions made to participating candidates. Again, this is especially important in a financing scheme like the State's, where the candidates must raise at least 50 percent of their campaign funding from private donors. Thus, even with the direct public subsidy, the participating candidate will have significant fundraising needs.[10]

The Appellants contend that the contribution refund is not narrowly tailored because it is not provided on a neutral basis, that is, only contributions made to publicly financed candidates are refundable. The Appellants misapprehend the nature and purpose of a campaign financing scheme. "The state need not be completely neutral on the matter of public financing of elections." Vote Choice, 4 F.3d at 39. Fundamentally, a public financing scheme is designed to afford a participating candidate certain benefits in exchange for that candidate's agreement to abide by certain restrictions. That the candidate's nonparticipating opponent is not afforded the same benefits misses the point: If the benefits, here the contribution refund, were conferred upon all candidates, participating and nonparticipating, there would be no incentive to participate, and the State's goals of decreasing the chances of

_____

[10]The district court determined that the contribution refund was constitutionally permissible as applied to candidates as well as contributors. Neither of the Appellants has made any showing or argument that their First Amendment rights as campaign contributors have been adversely impacted because of the refund provision. Accordingly, we confine our analysis to the effect upon the Appellants' rights as political candidates.

corruption and freeing up more of the candidates' time for campaigning would be frustrated. Thus, any favoritism enjoyed by the publicly financed candidate through the contribution refund subsidy is simply a permissible byproduct of the campaign financing process. See RNC, 487 F. Supp. at 285 ("If a candidate were permitted, in addition to receipt of public funds, to raise and expend unlimited private funds, the purpose of public financing would be defeated.").[11]

The Appellants contend that the contribution refund is not necessary to achieve additional candidate participation, citing Day v. Holahan, 34 F.3d 1356 (8th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995), where we held that Minnesota's independent expenditure provision was not narrowly tailored for that very reason.[12] The independent expenditure provision assailed in Day, however, bore a strikingly different pedigree than the contribution refund at issue here. In Day, Minnesota sought to justify the independent expenditure provision on the basis that it was designed to encourage candidate participation in the public financing scheme. Id. at 1361. We rejected this argument as specious because the purported interest, "no matter how compelling in the abstract, is not legitimate" since candidate participation in the public

_____

[11]We also reject the Appellants' claim that the language of the refund receipt form puts the State's imprimatur on publicly funded candidates. The receipt merely informs the contributor in innocuous language that the candidate has agreed to abide by certain campaign expenditure limits and that the contributor may obtain a refund on any contribution to that candidate.

[12]The independent expenditure provision at issue in Day operated to increase the expenditure limit for a publicly financed candidate in an amount expended by a political committee or political fund either advocating the candidate's defeat or in support of the candidate's opponent. For example, assuming candidate X is publicly funded and he is opposed by candidate Y, when a political committee or fund expends $1000 in support of Y or in opposition to X, candidate X's expenditure limits increase by $1,000.

financing scheme was approaching 100 percent when the challenged provision was enacted.  Id.; see also id. ("One hardly could be faulted for concluding that this `compelling' state interest was contrived for the purposes of this litigation.").

By contrast, the contribution refund at issue here, or a functional equivalent tax credit, has been part of the State's public campaign financing plan from almost its inception.  The State enacted its present public financing program in 1976 and in 1978 created a tax credit for contributions made to participating candidates.  The tax credit became the present tax refund in 1991, and with the exception of a three-year hiatus (1987-1990), the tax credit/refund has been in effect since 1978.  The State submits, and the Appellants have presented no evidence to the contrary, that this concept has played an integral role in attaining the almost 100 percent candidate participation in its program.  Thus, the circumstances surrounding the enactment of the contribution refund make Day inapposite.

In sum, we conclude that the expenditure limitation waiver and the contribution refund are each tailored in a sufficiently narrow manner to serve the compelling government interests the State has identified.  Therefore, even if the challenged provisions somehow burden the Appellants' First Amendment rights, the provisions pass constitutional muster.

IV.

Finally, the Appellants contend that the campaign provisions at issue unfairly discriminate against challengers because, all other things being equal, an incumbent has greater name recognition and fundraising capability than a challenger.  Although the constitutional basis upon which Appellants' rest this contention is

not entirely clear, in essence it seems to be that the provisions are biased in favor of an incumbent because they fail to place a challenger on an equal footing with the incumbent and are thereby coercive with respect to challengers.

The Appellants contend that the present statute is designed to make it more difficult for a challenger to mount a credible campaign against an incumbent, thus claiming that the Minnesota legislature intended to discriminate against challengers. As support for this argument, they focus on the change in the statute which permits any nonparticipating opponent to trigger the waiver for a participating candidate, in contrast to the prior expenditure waiver wherein only a major-party candidate could trigger the waiver. The Appellants contend that by eliminating this loophole, the State has eliminated the only realistic method by which a challenger can run a credible campaign: by running as a nonparticipating, privately-financed, independent candidate. Before the statute was amended, an independent challenger, i.e., one not a major-party candidate, could raise an unlimited amount of money and make an unlimited amount of campaign expenditures, and his publicly-financed incumbent opponent would still be bound to the expenditure limits.

The Appellants offer the comments of a long-time incumbent member of the Minnesota House of Representatives as support for their argument that, by enacting the 1996 amendment, the Minnesota legislature sought to discriminate against challengers. This legislator stated her belief that the amendment was necessary to correct a circumstance that she had personally encountered in her previous election campaign: her independent, privately-financed, non-major-party opponent was able to spend an unlimited amount on the campaign while, because of the major-party clause, she was still bound by the expenditure limits applicable to her office as a publicly financed candidate. This legislator went on to state

that she was a member of the conference committee that sponsored the previous expenditure limitation waiver and that it was not the intent of the sponsors of the previous bill to create the situation she encountered in her campaign; therefore, she argued that the amendment should be adopted to make the triggering act applicable to all candidates. The Appellants argue that this illustrates the invidious anti-challenger intent behind the enactment of the amendment. There are, however, numerous flaws in the argument.

First, as we noted above, we are not inclined to impute the statements of an individual legislator concerning the purpose underlying a particular piece of legislation to the entire legislative body. Second, even if we were, these statements do not illustrate that the members of the Minnesota legislature sought, by enacting the amendment, to make it difficult for a challenger to mount a credible challenge. The amendment simply eliminated a loophole in the expenditure limitation waiver, the effect of which the prior legislature did not envision. It is, quite simply, nothing more than a curative act. A statute which makes its requirements applicable to all candidates, regardless of party affiliation, can hardly be deemed discriminatory. We cannot identify any discriminatory purpose in this legislator's statements, or in the Minnesota legislature in general, as the reason for the enactment of the 1996 amendment.

As the RNC court aptly observed, in every race for elected office one candidate possesses certain advantages over his opponent, regardless of whether the campaigns are publicly or privately funded, and that it is inconsistent with the purposes underlying a public campaign financing program to attempt to eliminate this discrepancy. 487 F. Supp. at 285-87. Further, the Appellants have presented no persuasive evidence that the Minnesota legislature was motivated by a discriminatory purpose against challengers when it enacted these provisions, which on their face

-24-

apply evenhandedly to all candidates for a particular public office. See Buckley, 424 U.S. at 31 ("Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions.").

Finally, the Appellants fail to acknowledge the ways that the State's program actually operates to the benefit of challengers, rather than to their detriment. For instance, in a situation where the challenger enrolls in the State's financing system, an incumbent opponent, who the Appellants aver possesses greater name recognition and fundraising ability, is confronted with the choice of whether to enroll in the State's public financing plan or opt for private funding for the campaign. If the incumbent enrolls in the State's public financing plan, then he is bound by the State's expenditure limits and his alleged advantage in fundraising capacity is diminished significantly.[13] On the other hand, if the incumbent opted in favor of private funding, the publicly financed challenger would be permitted to disregard the expenditure limits and retain the public subsidy once the privately funded incumbent exceeded the triggering levels in either contributions or expenditures. In either situation, significant benefits accrue to the challenger. Moreover, for the challenger who actually possesses no name recognition or fundraising ability, enrollment in the State's plan can be particularly advantageous: Assuming he meets the threshold requirements to be eligible for public funding, the unknown candidate receives a public subsidy simply for agreeing to limit expenditures. See Buckley, 424 U.S. at 107-08 ("candidates with lesser fundraising abilities will gain substantial benefits from matching funds. In addition, one

---

[13]The incumbent's alleged advantage would not be reduced to a complete nullity because publicly financed candidates must still raise at least 50 percent of their campaign funding through private means.

eligibility requirement for matching funds is acceptance of an expenditure ceiling, and candidates with little fundraising ability will be able to increase their spending relative to candidates capable of raising large amounts in private funds."). Finally, the State's program provides an additional benefit for first-time candidates; such a candidate is permitted to exceed the specified expenditure limits by 10 percent, presumably to permit the candidate to attempt to close any name recognition gap enjoyed by the incumbent. See Minn. Stat. Ann. § 10A.25(2)(c).

Thus, the State's plan cannot in any manner be construed to impermissibly discriminate against challengers.[14]

In sum, we believe that the amended statute does not burden a candidate's First Amendment rights. Even if it does burden the candidate's Free Speech rights, it survives strict scrutiny, and it does not impermissibly discriminate against challengers.

---

[14]We also decline to consider the Appellants' argument that Service Employees Int'l Union v. Fair Political Practices Comm'n, 955 F.2d 1312 (9th Cir.), cert. denied, 505 U.S. 1230 (1992), counsels in favor of a conclusion that the State's scheme favors incumbents. At issue in Service Employees was a California contribution limit that was keyed to fiscal years, rather than an entire election cycle. Id. at 1314-15. The Service Employees court held that such a limitation impermissibly favored incumbents because they were able to receive campaign contributions up to the limits each year in the election cycle, whereas challengers, whom the court suggested typically do not decide to run for office until the year of the election, would only be able to collect contributions for one year. Id. at 1316-21. The Appellants point out that the State in this case similarly calculates its contribution limits on a calendar year, rather than election cycle, basis. However, the Appellants have challenged this element of the State's financing scheme for the first time on appeal. Neither their complaint nor the parties or the district court below mentioned this issue. Thus, this particular argument has been waived. See United States v. One Parcel of Property, 959 F.2d 101, 104 (8th Cir. 1992) (argument not raised in the district court is waived).

V.

We have examined the remaining issues and subissues raised by the Appellants and have determined that they lack merit. For the reasons enumerated above, we affirm the judgment of the district court.

Lay, Circuit Judge, dissenting:

I respectfully dissent.

As the majority recognizes, while this appeal was pending, Minnesota amended a key provision of its campaign finance laws. Prior to the 1996 amendment, the spending limits waiver for publicly financed candidates took effect when that candidate's major party opponent failed to agree by September 1 of an election year to abide by the state's "voluntary" spending limits. See Minn. Stat. §§ 10A.25(10)(b)(i), 10A.322(1)(b) (1994). The 1996 amendment waives the spending limit for a publicly financed candidate if any of her privately financed opponents--major or minor party--has raised or spent more than twenty percent of the spending limit as of ten days before the primary, or more than fifty percent of the spending limit thereafter. See 1996 Minn. Sess. Law Serv. Ch. 459 (S.F. 840), § 2 (West 1996) (amending Minn. Stat. § 10A.25(10)). Notwithstanding this amendment, the plaintiffs still seek prospective injunctive relief as to Minn. Stat. § 10A.25(10)(b) (1994), which no longer exists. It has been repealed. As such, that part of the case is moot. Although both parties argue we can decide this appeal notwithstanding this change in law, this court's subject matter jurisdiction and the exercise of judicial power cannot be controlled by the desires of the parties. See Insurance Corp. of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject matter jurisdiction upon a federal court.").

-27-

As the majority recognizes, this court "must review the District Court's judgment in light of presently existing [state] law, not the law in effect at the time that judgment was rendered." Fusari v. Steinberg, 419 U.S. 379, 387 (1975); Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414 (1972) (per curiam).

The majority recognizes that the only basis upon which this court should afford review at this time is to allow a challenge to the legality of the state's ongoing attempt to allegedly chill, by whatever means, plaintiff's freedom of speech as represented by the 1996 amendment. Nonetheless, in my judgment, deciding this issue prior to a review by the district court offends jurisprudential principles. At the very best, this court should remand this case to the district court to allow the plaintiffs to amend their complaint and make whatever challenge to the new law they wish to make. See id. at 415.

The Supreme Court has held that a federal court is not deprived of its power when a governmental entity enacts a new law that "disadvantages [the plaintiffs] in the same fundamental way" as the prior law challenged in the complaint. Northeastern Florida Chapter v. City of Jacksonville, 508 U.S. 656, 662 (1993). In such a case, the plaintiff's injury is redressable by "a judicial decree directing the [governmental entity] to discontinue its [challenged] program[.]" See id. at 666 n.5. Such a rule is necessary to prevent a governmental defendant from rendering a case moot "by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." Id. at 662. On the other hand, if a law is "changed substantially," such that the "challenged conduct" by the governmental entity is not likely to reoccur, then the case is moot. Id. at 662 n.3.[15]

---

[15]In Northeastern Florida Chapter, the Court held the case was not mooted by the City of Jacksonville's enactment of an amended minority set-aside ordinance. The Court reasoned that

-28-

Whether this court should review the current campaign finance scheme (as opposed to the now repealed statute) presents a close question of justiciability. It is my view that the 1996 amendment does not fundamentally alter the burdens on speech arising from the spending limits waiver and the contribution refund. See id. at 662. Further, the amendment appears to be sufficiently clear such that we are not left to speculate as to how the new law will operate in practice. Cf. Fusari, 419 U.S. at 388-89 (expressing uncertainty as to how state will implement amended welfare benefits law enacted in response to lower court decision striking law down as violating due process).

On the other hand, the 1996 amendment has potential constitutional significance, see, e.g., Wilkinson v. Jones, 876 F. Supp. 916, 927 (W.D. Ky. 1995) (finding constitutional significance in the manner in which spending limits waiver is triggered), and thus the amendment cannot be readily characterized as an "insignificant" change in law. See Northeastern Florida Chapter, 508 U.S. at 662. Moreover, as indicated, under the new amendment it is not readily apparent what specific judicial relief the plaintiffs could obtain since the law they challenged in their

_____

although "[t]he new ordinance may disadvantage [the plaintiffs] to a lesser degree than the old one, . . . insofar as it accords preferential treatment to black- and female-owned contractors-- and, in particular, insofar as its 'Sheltered Market Plan' is a 'set aside' by another name--it disadvantages them in the same fundamental way." Id. at 662. The Court recognized that the amended city ordinance applied only to African-Americans and females, rather than seven minority groups, and provided flexibility in the manner of preferential treatment on any given city project. Id. at 661. The Court emphasized that one of the programs, the Sheltered Market Plan, was essentially the same as the law challenged in the complaint. Unlike the prior version of the law, the amended ordinance also contained a ten-year sunset provision and identified several present effects of past discrimination which justified the affirmative action in favor of African-Americans and females. See id. at 674 (O'Connor, J., dissenting). The majority concluded such changes were insignificant; the dissent disagreed.

complaint can no longer be enjoined.[16]  In light of these factors, I believe the proper course would be to vacate the district court's judgment and remand the case to the district court for further proceedings.  Even if this course is not required by the constitutional limitations on this court's jurisdiction, I favor such a course as a matter of judicial discretion.  See Northeastern Florida Chapter, 508 U.S. at 677 (O'Connor, J., dissenting).  The district court's analysis of the new law would undoubtedly help to evaluate the constitutional issues before us.[17]  Nonetheless, the

---

[16]In their amended complaint, the plaintiffs asked for a declaration that several provisions of Minnesota's campaign finance laws, including Minn. Stat. § 10A.25(10)(b) ("subdivision 10(b)"), are unconstitutional.  J.A. 42.  The plaintiffs also sought an injunction against the enforcement of "the unconstitutional sections of Minnesota's public campaign financing system" and "such other and further relief as this court shall deem just and equitable."  Id.  In light of the 1996 amendment, enjoining subdivision 10(b) would no longer make sense because that section now provides for notification of publicly financed opponents when a privately financed candidate exceeds certain minimal spending or fundraising thresholds.  The substance of old subdivision 10(b) is now codified, as substantially amended, in the new subdivision 10(a) of § 10A.25. See Minn. Sess. Law Serv. Ch. 459 (S.F. 840), § 2 (West 1996). It is unclear what the proper relief in this case would be if the state laws were found to be unconstitutional, although some form of meaningful relief could probably be found.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 560 (3d Cir. 1994) (en banc) ("[W]hen a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot.")  (quoting Church of Scientology v. United States, 506 U.S. 9, 12 (1992)). Following the Court's suggestion in Northeastern Florida Chapter, 508 U.S. at 666 n.5, perhaps an injunction against the state's "program" of campaign finance would be proper relief for the plaintiffs.  In any event, I would leave this determination to the district court in the first instance.  See note 16, infra.

[17]In their letter brief to this court, the plaintiffs argue the amendments make the law more coercive than the prior version of the law because it applies to all privately financed candidates, not just major party candidates who are privately financed.  The state has not had an opportunity to respond to this claim and, on the current record, such a claim is difficult to evaluate.  Cf. Fusari, 419 U.S. at 385-866, 387 n.12

majority exercises jurisdiction and upholds the amended Minnesota campaign finance laws.  I respectfully disagree with this ruling and thus dissent as well on the merits.

Burdens on Speech

In Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam), the Supreme Court made it clear that limits on expenditures in election campaigns are generally unconstitutional because they suppress communication "'at the core of our electoral process and of the First Amendment freedoms.'"  Id. at 39 (quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968)).  The Court found the First Amendment broadly protects political speech to assure the "'unfettered interchange of ideas for the bringing about of political and social changes desired by the people[,]'" id. at 14 (quoting Roth v. United States, 354 U.S. 476, 484 (1957)), and that such protection extends even to what some see as excessive campaign spending.  As Buckley stated some twenty years ago, "[t]here is nothing invidious, improper, or unhealthy in permitting [campaign] funds to be spent to carry the candidate's message to the electorate."  Id. at 56.

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.  This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.  The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs.  Speeches and rallies generally necessitate hiring a hall and publicizing the event.  The electorate's increasing dependence on television, radio, and other mass media for news and information has made

_____

(reviewing the legislative history and purpose of the amended statute and noting that the Court's review was "largely unassisted by counsel").

these expensive modes of communication indispensable instruments of effective political speech.

Id. at 19 (footnote omitted).  In light of the constitutional protection afforded campaign speech, the Court held that controlling campaign costs was not a legitimate governmental interest.

> The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise.  In the free society ordained by our Constitution it is not the government, but the people--individually as citizens and candidates and collectively as associations and political committees--who must retain control over the quantity and range of debate on public issues in a political campaign.

Id. at 57.

In upholding the Minnesota campaign finance scheme the majority, with all due respect, fails to evaluate properly these fundamental constitutional principles involved in this case.

The state distinguishes Buckley by arguing that if the state provides a public subsidy, which is voluntarily accepted, then Buckley does not control.  As Buckley points out,

> Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations.  Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.

Id. at 57 n.65 (emphasis added).

The difficulty we face here is that under Minnesota's campaign finance law, once a publicly financed candidate has chosen to accept the limits, she is provided a spending limits waiver, if her opponent chooses to exercise her constitutional right to forgo public financing and exceed the statutorily imposed limit.[18] In the majority's view, the enjoyment of public subsidies (including the contribution refund) and a waiver of the spending limits by a publicly financed candidate is nothing more than an inducement by the state "to avert a powerful disincentive for participation in its public financing scheme: namely, a concern of being grossly outspent by a privately financed opponent with no expenditure limit." Ante at 12.

I respectfully submit such an analysis is irrelevant in evaluating the concerns of whether the non-public financed candidate's First Amendment rights are chilled. This case is not about the publicly financed candidate's free speech rights. It is not a matter of balancing benefits with restrictions. Nor is it a question of speech restricted by time, place or manner. The issue is whether a candidate who faces a choice not to limit her full access to political speech will be any worse off in choosing to do so. When a candidate voluntarily abandons all the benefits of public subsidies (including the contribution refund) to exercise her constitutional right, it is a voluntary choice.[19] When such a

_____

[18]The spending limits waiver was adopted in 1988. Prior to 1988, publicly financed candidates were bound by the spending limits to which they agreed, regardless of their opponent's actions. See, e.g., Minn. Stat. § 10A.25(10) (1986). The pre-1988 law was thus consistent with the public financing of Presidential campaigns upheld in Buckley, 424 U.S. at 85-108, and Republican Nat'l Comm. v. FEC, 487 F. Supp. 280, 283-86 (S.D.N.Y.) (three-judge court), aff'd mem., 445 U.S. 955 (1980) ("RNC").

[19]See RNC, 487 F. Supp. at 283-84 ("Each candidate remains free under the Fund Act, instead of opting for public funding, to attempt through private funding to raise more than the

-33-

choice is made, however, Minnesota's campaign finance scheme adds disincentives which make a privately financed candidate worse off than she otherwise would be.[20] Her publicly financed opponent, who has chosen to receive a public subsidy, can now keep the public subsidy, obtain the benefit of the contribution refund for all past and future contributions, and spend without limit.[21]

With all due respect to the majority's interpretation, it seems plain that Minnesota's current campaign financing scheme, including the spending limits waiver and the retention of the public subsidy, as well as the contribution refund,[22] directly

_____

'$20,000,000 plus' public funding limit and to spend any amount of funds raised by private funding, without any ceiling."); cf. Buckley, 424 U.S. at 99 ("[S]ince any major-party candidate accepting public financing of a campaign voluntarily assents to a spending ceiling, other candidates will be able to spend more in relation to the major-party candidates."); id. at 101 ("Plainly, campaigns can be successfully carried out by means other than public financing; they have been up to this date, and this avenue is still open to all candidates.").

[20]To urge that such disincentives are not per se "coercive because they are not inherently penal" is meaningless rhetoric. See ante at 11. The disincentives are invoked as a means to influence directly a candidate's choice (to keep the candidate in line within the spending limit). To call such coercive conduct by any other name does not diminish the effect upon the candidate's choice. The issue is whether a candidate's decision to exercise her constitutional right to free speech has been chilled. When the opponent's spending limit is automatically removed, the opponent's public subsidy retained, and more tax benefits to the opponent's contributors become available, it seems ineluctable to me that the candidate's right has been chilled.

[21]The law even allows the absurd situation where a candidate can wait until her opponent has made a choice to exercise unlimited speech, then agree to the spending limit and receive the public subsidy, but then exceed the limit without penalty and keep the subsidy. In such circumstances, the publicly financed candidate's spending limit is illusory from the outset.

[22]The contribution refund was adopted in 1991. From 1978 to 1987, however, Minnesota provided a tax credit to contributors

chills the exercise of a privately financed candidate's constitutional right to unfettered political speech.

This court has on two prior occasions recognized the penalizing nature of related provisions of Minnesota's campaign finance laws. First, in Weber v. Heaney, 995 F.2d 872 (8th Cir. 1993), which found similar provisions in Minnesota's congressional campaign finance laws preempted, this court stated that "candidates who do not agree to be bound by the spending limits are penalized because their opponents who have agreed to the limits will still receive public financing, but will not be bound to their agreement." Id. at 877 n.7.[23]

Second, in Day v. Holahan, 34 F.3d 1356, 1359-62 (8th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995), this court struck down a Minnesota law which allowed a publicly financed candidate to exceed her spending limit by the amount of "independent expenditures"[24] against her and receive an additional direct public subsidy. In Day, the court reasoned that this provision burdened speech because:

> The knowledge that a candidate who one does not want to be elected will have her spending limits increased and will receive a public subsidy equal to half the amount of the independent expenditure, as a direct result of that

---

for contributions up to a certain level, which was substantially similar to the current contribution refund system.

[23]Although this statement may be dicta, as the majority finds, the opinion, written by Judge Magill in which Judge Fagg and Judge Hansen joined, accurately characterizes the penalizing nature of Minnesota's campaign financing scheme.

[24]An independent expenditure was defined as "an expenditure expressly advocating the election or defeat of a clearly identified candidate" by an individual, political committee or political fund which had expended more than $100 on such expenditures. See Day, 34 F.3d at 1359 (citations omitted).

independent expenditure, chills the free exercise of that
protected speech.

Id. at 1360.  Although there is no additional direct public subsidy
in this case,[25] the public subsidy involved in the contribution

---

[25]In Wilkinson, which upheld a spending limits waiver
against a motion for a preliminary injunction, the district court
distinguished Day in part on the basis that additional public
subsidies available to a publicly financed candidate facing a
privately financed opponent in Kentucky were not "automatic" but
"may only be obtained when additional private contributions are
raised."  876 F. Supp. at 927.  I do not think this distinction
is of constitutional significance in this case when the
additional private contributions are subsidized, thus enhancing
the publicly financed candidate's fundraising ability.

Wilkinson also distinguished Day on the basis that the
spending limit waiver took effect when the first dollar of an
independent expenditure was made, whereas under Kentucky's
campaign financing scheme the spending limits waiver did not
occur until a privately financed gubernatorial candidate actually
raised or spent in excess of $1.8 million, which provided "a
significant amount of unconstrained speech on the issues" before
the spending limits waiver came into play.  Id.  Such a
distinction is not applicable in this case.  The spending limits
waiver here takes effect when the privately financed candidate
exceeds minimal spending or fundraising thresholds:  20 percent
of the spending limit ten days prior to the primary election or
50 percent of the spending limit thereafter.  See 1996 Minn.
Sess. Law Serv. Ch. 459 (S.F. 840), § 2  (West 1996).  In light
of the $21,576 spending limit for state representative candidates
in this case, J.A. 21, these minimal thresholds for triggering
the spending limits waiver do not provide for as significant an
amount of unconstrained speech on the issues as the $1.8 million
available in Wilkinson.  Cf. Buckley, 424 U.S. at 20 n.20 (noting
that full-page advertisement in metropolitan newspaper in 1975
cost $6,971.04).

Wilkinson further distinguished Day on the basis that a
spending limits waiver coupled with additional public subsidies
chills an independent organization's free speech but not a
candidate's.  Specifically, Wilkinson suggested that in Day, an
independent organization did not have any choice about whether to
act in a manner that would enhance the campaign of the candidate
whom it was trying to defeat, whereas in Wilkinson the decision
rested "within the privately-financed candidate's complete
control" by that candidate's ultimate actions in raising and

refund clearly "enhance[s] [the publicly financed] candidate's fund raising ability."  See Weber, 995 F.2d at 877 n.7.  Furthermore, the indirect public subsidies through the contribution refund are potentially unlimited, and thus may have a greater chilling effect than the limited additional subsidy at issue in Day.  Finally, the spending limits in this case will not only be "increased" in an amount equal to one half of the opposing expenditures, as in Day, but will be wholly removed.  Thus, the burdens imposed on the core political speech of privately financed candidates in this case are greater than, or at least substantially similar to, the burdens

_____

spending money in excess of $1.8 million.  See 876 F. Supp. at 927.  Such distinctions are not valid in this case.

    First, the privately financed candidate has no genuine control over whether to help her opponent's campaign, because she triggers her opponent's spending limits waiver by exceeding minimal spending or fundraising thresholds.  A competitive privately financed candidate would almost certainly need to exceed the minimal thresholds in order to avoid being substantially outspent by the publicly financed candidate.  The record does not show any successful privately financed candidates who have spent less than the thresholds.  In 1992, average spending by all candidates, publicly and privately financed, exceeded the thresholds that now trigger the spending limits waiver.  See J.A. 22.  In these circumstances, it is hard to say that the privately financed candidate in Minnesota retains "complete control" over the spending limits waiver.  In Wilkinson, by contrast, the privately financed candidates had no fear of being outspent because she retained genuine control until she actually spent or raised in excess of $1.8 million, i.e., the spending limit applicable to publicly financed candidates.

    Second, there is no basis for holding that the provisions at issue here will chill an independent organization's free speech but not a candidate's.  A candidate's interest in speaking is in winning the election in which she is running; her speech will clearly be chilled if, by speaking, she advances the campaign of her opponent.  An organization making an independent expenditure, by contrast, may be more willing to risk helping an opponent to some extent by engaging in political speech in order to educate the public and otherwise to advance the organization's larger purposes.  Thus, if there is any difference between the chilling effect on the two, the burden on a candidate's speech is greater.

-37-

imposed on independent organizations in Day, and cannot adequately be distinguished. In accord with Weber and Day, I find Minnesota's campaign finance scheme burdens a candidate's free speech rights by chilling her decision to increase her political speech by exceeding the spending limits.

Avoiding the fundamental principles of Buckley and the decisions of our court, the majority seeks refuge in the First Circuit opinion in Vote Choice, Inc. v. DiStefano, 4 F.3d 26 (1st Cir. 1993), which upheld a "cap gap" between publicly financed candidates, who may receive up to $2,000 per campaign contribution, and those who choose private financing, who may only receive up to $1,000 per donor. Id. at 37-40. The First Circuit found the scheme constitutional since it offered a relative balance between the benefits given to, and the restrictions placed on, publicly financed candidates.[26] Even under this "rough proportionality" approach, id. at 39, the Minnesota campaign finance scheme must fall. A scheme which wholly releases a publicly financed candidate from the only restriction she must accept to receive public financing in the first place is not roughly proportional.[27]

---

[26]Vote Choice found the "cap gap" was not "impermissibly coercive" in part because the $2,000 limit was not contingent on the opponent's decision to rely on private funding, see 4 F.3d at 38, 37 n.13, and neither gubernatorial candidate had accepted public funding, which showed that the "cap gap" incentive was not coercive, id. at 39 n.14. The incentives to publicly financed candidates here are contingent on their opponents' decision. The record also does not show any races in which all candidates were privately financed. Thus, important factors in Vote Choice which tended to show the cap gap was not coercive are not present in this case.

[27]Vote Choice, as the majority concedes, did not decide the very issue submitted here, that is, whether a candidate could waive the expenditure limits and retain a public subsidy if opposed by a privately financed candidate. Vote Choice did note, however, that Rhode Island's law provides a spending limits waiver for publicly financed candidates in certain circumstances. 4 F.3d at 30 n.5. This provision of Rhode Island's law, which

Compelling State Interest

I also respectfully disagree with the majority's conclusion that the state has shown its law is narrowly tailored to a compelling state interest.

The majority identifies the following state interests that are served by the spending limits waiver:  (1) reduce the possibility of corruption, (2) diminish the need for fundraising, (3) allow more time for discussing issues, (4) stimulate participation in the public finance scheme, (5) protect candidates who agree to the limits from being substantially outspent by their opponents, and (6) reward candidates who initially agree to limit spending but are nonetheless subsequently released from the limits.

The state's interests in guarding against corruption, reducing the need for fundraising, and allowing more time for discussing issues--which are the classic justifications for campaign finance laws, see Buckley, 424 U.S. at 91; RNC, 487 F. Supp. at 284--are not directly served by the spending limits waiver in any substantial way.  In fact, the waiver, by allowing a candidate to raise unlimited private funds, defeats the purposes of the public subsidy because the candidate, once released from the spending limits, is likely to devote more time to fundraising and may

_____

was not challenged in Vote Choice, provides no support for the majority's holding in this case.  Rhode Island's law provides that a publicly financed candidate may exceed the spending limits only when and to the extent that the privately financed candidate exceeds the limits.  Id.  Further, no additional public subsidies are available to a publicly financed candidate above the $750,000 direct matching funds from the state.  See id. at 30.  Under Minnesota's law, by contrast, from the moment the general election campaign begins, if a publicly financed candidate faces a privately financed opponent who has spent or raised money in excess of the minimum thresholds, she may raise and spend unlimited funds all of which could potentially come from subsidized individual contributions.

develop "unhealthy obligations" to those additional individuals who donate.  See id. at 285 ("If a candidate were permitted, in addition to receipt of public funds, to raise and expend unlimited private funds, the purpose of public financing would be defeated.").

It is only in an indirect sense that the waiver might support the state's goals of guarding against corruption, reducing the need for fundraising, and allowing more time for discussing issues.  The state's theory is, if the spending limits waiver encourages more people to agree to abide by the limits, or forces them to do so, the waiver reduces the need for private fundraising and the potential for corruption.  Thus, the state's real interest in the spending limits waiver is to free candidates from fundraising and reduce the possibility of corruption by stimulating participation in its campaign finance program.[28]

Whether stimulating participation in a state's public campaign financing scheme is a compelling state interest in any circumstance is an open question in this circuit.  See Day, 34 F.3d at 1361. Assuming, but not agreeing, that stimulating participation in the public finance program is a legitimate state interest, I nonetheless find that under the facts and circumstances of this case, the state's interest in stimulating participation is not a compelling one, and the spending limits waiver and contribution

---

[28]The other interests--protecting candidates from being substantially outspent and rewarding candidates who initially agree to the limits--are means of stimulating participation in the state's campaign finance program.  If the state wanted to reward people who were positively inclined toward spending limits, on that basis alone, in such circumstances the spending limits waiver would constitute impermissible viewpoint discrimination.  Moreover, the fact that the state penalizes those who breach the spending limit, absent a waiver, shows the state has no independent interest in a candidate's initial agreement to those limits.

refund are not narrowly tailored to serve that interest. It is settled at least in this circuit that stimulating participation is not a compelling state interest if it is not necessary to actually stimulate such participation. Id. Since 1976, candidate participation rates in Minnesota's public finance program have been as follows:

| | |
|---|---|
| 1976 | 92% |
| 1986 | 77% |
| 1978 | 87% |
| 1988 | 89% |
| 1980 | 66% |
| 1990 | 93% |
| 1982 | 90% |
| 1992 | 95% |
| 1984 | 78% |
| 1994 | 92% |

J.A. 22. The contribution refund (or its tax credit predecessor in effect from 1978 to 1987) did not exist in 1976, 1988, or 1990, when the participation rates were 92, 89, and 93 percent, respectively.[29] Before the enactment of the spending limits waiver, participation rates were uniformly above 66 percent and were 92 percent in 1976 and 90 percent in 1982. This record belies the state's claim that the provisions challenged here are necessary to achieve substantial participation in the state's public financing scheme.

The spending limits waiver and contribution refund are also not narrowly tailored to achieve the state's interest with minimal

---

[29]The majority errs in its reasoning that because the tax refund or tax credit is long-standing, and the plaintiffs have not shown otherwise, the tax refund "has played an integral role in attaining the almost 100 percent candidate participation in its scheme." Ante at 22. As I have stated, in 1976, before the enactment of the tax credit, the participation rate was 92 percent, and during the three-year hiatus (1987-1990), the participation rates were 89 percent in 1988 and 93 percent in 1990. J.A. 22.

burden on a privately financed candidate's free speech rights. If the state is concerned that publicly financed candidates are "at an insurmountable disadvantage" against privately financed candidates in the absence of these provisions, ante at 18, it seems plain that the state's spending limits are too low. With a limit of $21,576 for candidates for state representative, J.A. 21, a candidate may reasonably feel endangered by the prospect of her opponent spending tens of thousands of dollars more in an aggressive advertising and direct mail campaign. The constitutionally proper means to stimulate participation is not to burden the privately financed candidate's speech, however, but rather to provide the publicly financed candidate with the opportunity for more speech through higher subsidies or higher spending limits, or both. See RNC, 487 F. Supp. at 285 (noting that candidates "will opt for public funding only if, in the candidate's view, it will enhance the candidate's powers of communication and association"); cf. Wilkinson, 876 F. Supp. at 927 (finding that the $1.8 million raised or spent in a gubernatorial campaign in Kentucky before a publicly-funded opponent's spending limit is waived provides "a significant amount of unconstrained speech").

Furthermore, the state could overcome the "insurmountable disadvantage" in a manner with less chilling effect on the free speech rights of privately financed candidates by providing only a partial spending limits waiver or by deferring the waiver of the spending limits until the privately financed candidate has actually exceeded the spending limit. Cf. Vote Choice, 4 F.3d at 30 n.5 (noting that Rhode Island's spending limits waiver, which was not challenged in that case, takes effect only when and to the extent that the privately financed candidate exceeds the limits). Likewise, the contribution refund would stimulate participation and yet have a less chilling effect on a privately financed candidate's speech if there were limits on the amount of indirect public subsidies a candidate could receive through such a program.

<u>Conclusion</u>

The district court declared unconstitutional a provision of Minnesota's campaign finance laws which allowed a publicly financed candidate to receive her privately financed opponent's share of available public funding. <u>See</u> Minn. Stat. § 10A.25(10)(b)(iii) (1994). The state did not appeal this ruling, and in 1996 the legislature repealed this provision. <u>See</u> 1996 Minn. Sess. Law Serv. Ch. 459 (S.F. 840), § 2 (West 1996). I would now also find Minnesota's spending limits waiver for publicly financed candidates unconstitutional. This waiver clearly chills the core political free speech rights of privately financed candidates for state representative, and does so without adequate justification for the burdens imposed on such speech. Furthermore, in light of the spending limits waiver, I would also find the contribution refund unconstitutional because it provides potentially unlimited public support for a public financed candidate and thereby coerces a candidate's choice as to whether to accept or decline the public financing of her campaign.[30]

For the reasons stated, I dissent.

---

[30]Under my view of the merits, I would remand this case to the district court to determine how to enjoin the enforcement of the contribution refund and the spending limits waiver under the 1996 amendment, <u>see</u> note 2, <u>supra</u>, and to determine if other provisions of the state's campaign finance law can remain. This is not to say that those provisions that allow candidates to receive a public subsidy in exchange for a binding agreement to adhere to specified limits standing alone cannot remain. As I have pointed out, if a candidate voluntarily chooses to accept a public subsidy in exchange for an agreement to adhere to specified limits, there is nothing unconstitutional about such a provision as long as it does not serve to chill the voluntary choice of the opposing candidate to decline public financing and exceed the spending limits. <u>See</u> <u>Buckley</u>, 424 U.S. at 57 n.65. Nonetheless, I would have the district court determine in the first instance how the spending limits waiver and contribution refund can be enjoined, and whether they are severable from the remaining provisions of Minnesota's campaign finance act.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.