STATE OF NEBRASKA EX REL. DON STENBERG, ATTORNEY
GENERAL OF THE STATE OF NEBRASKA, APPELLEE, V.
SCOTT MOORE, SECRETARY OF STATE OF THE STATE OF
NEBRASKA, APPELLANT.

605 N.W.2d 440

Filed February 4, 2000.   No. S-98-974.

David M. Pedersen and John W. McMullen, of Baird, Holm,
McEachen, Pedersen, Hamann & Strasheim, for appellant.

Don Stenberg, Attorney General, L. Steven Grasz, and Lynn
A. Melson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN,
McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is an appeal from a judgment of the district court for
Lancaster County determining that 1997 Neb. Laws, L.B. 420,
now codified at Neb. Rev. Stat. § 32-1614 (Reissue 1998), is
unconstitutional and invalid. Based upon our de novo review, we
reach the same conclusion and therefore affirm the judgment of
the district court.

## BACKGROUND

The Campaign Finance Limitation Act (Act), Neb. Rev. Stat.
§§ 32-1601 to 32-1614 (Reissue 1998 & Supp. 1999), was enacted
by the Legislature in 1992 and became operative on January 1,
1993. See § 32-1601 (Cum. Supp. 1992). In general, the Act allows
candidates for certain state offices to elect to limit their campaign

spending in order to become eligible for public campaign funding. *Id.* Under the Act in its original form, a candidate's agreement to abide by the spending limits was irrevocable. See §§ 32-1601 to 32-1610 (Cum. Supp. 1992). Originally, the Act did not impose any restrictions or requirements with respect to independent expenditures made by groups or committees supporting or opposing a candidate.

In 1997, the Act was amended to permit a candidate to revoke a prior decision to abide by the spending limitations under certain circumstances. The record reflects that the 1997 amendments were in response to events that took place during the 1996 state elections in Nebraska, when an independent political committee made substantial independent expenditures in support of two candidates within 8 days of the election. The most significant amendment, and the only one challenged in this action, was contained in § 14 of L.B. 420, now codified at § 32-1614, which we hereinafter refer to as "§ 14." The pertinent portions of § 14, as found in § 32-1614, provide:

(1) If a person as defined in section 49-1438, including an independent committee or a political party committee, determines more than forty-five days prior to a primary election or general election that it intends to make independent expenditures of two thousand dollars or more during the primary election period or the general election period for or against a candidate seeking nomination or election to a covered elective office, the person shall file a statement of intent to expend with the Nebraska Accountability and Disclosure Commission. The statement of intent to expend shall be filed no later than forty-five days prior to the date of the election at which the candidate is seeking nomination or election. The statement of intent to expend shall include:

. . . .

(e) The maximum amount of independent expenditures the person intends to spend in support of or in opposition to the candidate for the primary election period and the general election period.

(2) No person who has filed a statement of intent to expend shall make independent expenditures exceeding

twenty percent more than the amount stated in subdivision (1)(e) of this section or less than twenty percent less than such amount. No person shall make independent expenditures for a covered elective office without filing a statement of intent to expend under this section.

. . . .

(4) If a statement of intent to expend is filed pursuant to this section, (a) the candidate named in the statement if the expenditures are to be made in opposition to such candidate or (b) a candidate for the same office as the candidate named in the statement and on whose behalf the expenditures are to be made shall be allowed to withdraw an affidavit of intent to abide by the spending limitations of section 32-1604 if the candidate has not received public funds under the Campaign Finance Limitation Act. The withdrawal shall be accomplished by filing a written statement withdrawing his or her affidavit to abide and simultaneously filing an affidavit not to abide under subdivision (5)(a) of section 32-1604 at least thirty days prior to the election.

. . . .

(6) This section shall not apply to an individual making independent expenditures with his or her own funds. An individual making independent expenditures shall be required to file an independent expenditure report as required by section 49-1467.

An independent expenditure is defined as an expenditure which "is not made at the direction of, under the control of, or with the cooperation of another person and if the expenditure is not a contribution to a committee." Neb. Rev. Stat. § 49-1428 (Reissue 1998). See, also, § 32-1603.

On August 5, 1997, the Attorney General issued Att'y Gen. Op. No. 97038 at the request of Frank J. Daley, Jr., then acting executive director of the Nebraska Accountability and Disclosure Commission. The Attorney General concluded that enforcement of § 14 would unconstitutionally infringe on the First Amendment rights of the groups which are required to file a statement of intent to expend. In reliance upon this opinion, the Nebraska Accountability and Disclosure Commission notified the Attorney General that it would not enforce § 14.

Pursuant to Neb. Rev. Stat. § 84-215 (Reissue 1999), the Attorney General, as relator for the State of Nebraska, filed a petition for declaratory judgment in the district court for Lancaster County, requesting the court to find that § 14 violated the free speech clauses of both the Nebraska and the U.S. Constitutions. The petition named as respondent Scott Moore, the Secretary of State of the State of Nebraska, who is charged by § 84-215 with defending an action brought by the Attorney General to determine the validity of a statute.

On July 22, 1998, the district court granted summary judgment in favor of the Attorney General based upon its determination that § 14 is unconstitutional. The district court further determined that § 14 was severable from other provisions of L.B. 420, which were therefore unaffected by its judgment. The Secretary of State filed this timely appeal.

## ASSIGNMENTS OF ERROR

The Secretary of State assigns, restated, that the district court erred (1) in finding that § 14 imposes a substantial burden on the First Amendment rights of Nebraska citizens to engage in political expression and (2) in not finding that § 14 was narrowly tailored to serve a compelling state interest.

## STANDARD OF REVIEW

■ Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *State ex rel. Stenberg v. Moore, ante* p. 199, 602 N.W.2d 465 (1999); *Bauers v. City of Lincoln,* 255 Neb. 572, 586 N.W.2d 452 (1998).

## ANALYSIS

### INTRODUCTION

The Attorney General contends that § 14 is in violation of the free speech provision of article I, § 5, of the Constitution of the State of Nebraska and the Free Speech Clause of the First Amendment to the U.S. Constitution in that it abridges the freedom of speech of those persons required to file a statement of intent to expend. The Secretary of State argues that the statute is a legitimate exercise of legislative authority intended to ensure

that candidates who agree to abide by the spending limits set forth in the Act receive notice of independent expenditures in sufficient time to permit them to make an educated decision whether to withdraw their agreement in order to effectively respond to such expenditures. The parties have not directed us to any state or federal statute containing provisions substantially similar to § 14, and our research has disclosed none. The issue before us is thus one of first impression.

## ANALYTICAL FRAMEWORK

■ This court has never articulated a specific test to be applied in determining whether provisions of the Act violate the constitutional guarantee of freedom of speech. We have stated, however, that the guarantee of freedom of speech is the same under both the Nebraska and the U.S. Constitutions. *Pick v. Nelson*, 247 Neb. 487, 528 N.W.2d 309 (1995). In *Pick*, we adopted the reasoning and analytical framework utilized by the U.S. Supreme Court in reviewing various state election statutes. We therefore look to the analysis utilized by federal courts in addressing constitutional challenges to various state and federal statutory restrictions upon independent campaign expenditures.

■ In *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 657, 110 S. Ct. 1391, 108 L. Ed. 2d 652 (1990), the Supreme Court held that in order to determine whether a Michigan statute imposing restrictions on corporate political expenditures could be applied to a state chamber of commerce, it was required to "ascertain whether [the statutory restriction] burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." This two-part test was applied by the Eighth Circuit Court of Appeals in *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996), involving a First Amendment challenge to provisions of a Minnesota campaign financing statute, and *Shrink Missouri Government PAC v. Maupin*, 71 F.3d 1422 (8th Cir. 1995), involving a challenge to a Missouri statute imposing limits on certain political campaign contributions and expenditures. We conclude that the test articulated in *Austin, supra,* is the appropriate analytical framework for our evaluation of the constitutionality of § 14.

DOES § 14 BURDEN EXERCISE OF POLITICAL SPEECH?

The statute in question deals with the subject of "independent expenditures . . . for or against a candidate seeking nomination or election to a covered elective office." § 32-1614(1). The U.S. Supreme Court has characterized this subject as "an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). As the Court observed:

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). Although First Amendment protections are not confined to "the exposition of ideas," *Winters v. New York*, 333 U.S. 507, 510 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . ." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

*Buckley*, 424 U.S. at 14-15.

Section 14 contains two interrelated provisions which apply to independent political campaign expenditures. First, it provides that a political group or committee may not make inde-

pendent expenditures exceeding $2,000 unless it files a statement of intent to expend a specific amount in excess thereof at least 45 days prior to an election. See § 32-1614(1). Second, it prohibits the group or committee filing such a statement from spending more than 120 percent or less than 80 percent of the amount designated, which we will refer to as the "20/20 provision." See § 32-1614(2). The Secretary of State contends that the statute establishes "time, place, and manner regulations" similar to those which have been upheld against First Amendment challenges. Brief for appellant at 22. He relies on *Rosario v. Rockefeller*, 410 U.S. 752, 93 S. Ct. 1245, 36 L. Ed. 2d 1 (1973), in which the Supreme Court upheld the constitutionality of a New York election law which required a person wishing to vote in a primary election to enroll in a political party at least 30 days prior to the general election held in the preceding year. The Court reasoned that the statute did not absolutely disenfranchise potential voters, but merely imposed a time deadline upon voter registration. The Secretary of State argues that requiring a statement of intent to make independent expenditures exceeding $2,000 is a similar deadline and that the 20/20 provision is a necessary enforcement mechanism without which the statement of intent would serve no purpose.

In *Buckley v. Valeo*, 424 U.S. 1, 18, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), the Court held that a statutory $1,000 limit on independent political expenditures could not be upheld as a time, place, and manner regulation because it imposed "direct quantity restrictions" upon political speech. The Court reasoned:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

424 U.S. at 19. The court further noted that "[t]he electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." *Id.* The Attorney General argues that, as in

*Buckley,* the statute under consideration in the present case results in a direct quantity restriction on political speech.

It is true that *Buckley* involved a fixed dollar limitation imposed by the government upon independent political expenditures, whereas § 14 permits a group wishing to spend more than $2,000 on a campaign to place whatever limitation it chooses upon itself, so long as it does so more than 45 days prior to the election and then complies with the 20/20 provision. In our view, however, this distinction is not material to our analysis because of the inescapable fact that § 14 restricts the previously unrestricted right of groups to make independent expenditures in support of or in opposition to political candidates. If a group does not file a statement of intent to expend pursuant to § 32-1614(1), it is subject to a $2,000 statutory cap on independent expenditures. On the other hand, if the statement of intent to expend is filed at least 45 days prior to the election as required by the statute, the filer is restricted to spending not more than 120 percent of the amount designated in the statement and becomes obligated to spend at least 80 percent of that amount, regardless of circumstances arising in the last 45 days of the campaign, which may prompt a desire to spend more or less than the amount set forth in the filer's statement. Thus, § 14 replaced the previously unfettered discretion of a group or committee to engage in political speech by making independent political expenditures subject to two options, both of which involve a quantitative regulation of that right.

"[R]estrictions on independent expenditures significantly impair the ability of individuals and groups to engage in direct political advocacy and 'represent substantial . . . restraints on the quantity and diversity of political speech.'" *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n,* 518 U.S. 604, 615, 116 S. Ct. 2309, 135 L. Ed. 2d 795 (1996), quoting *Buckley, supra.* The First Amendment protects both the right to speak and the right not to speak. *Harper & Row v. Nation Enterprises,* 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985); *Wooley v. Maynard,* 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). Operation of § 14 would necessarily result in either a restriction upon the right to engage in political speech through independent political expenditures in

excess of $2,000 for groups which elect not to file a statement of intent to expend within the prescribed time period or a restriction to a greater amount, coupled with an obligation to spend a specific minimum amount, in circumstances where a timely filing is made and the 20/20 provision is triggered. We therefore conclude that § 14 is not simply a time, place, and manner regulation, but, rather, imposes direct quantity restrictions which burden the exercise of political speech. We must therefore proceed to the second step of our analytical framework in order to determine its constitutionality.

### Is § 14 Narrowly Tailored to Achieve Compelling State Interest?

The Supreme Court has stated that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *FEC v. National Conservative PAC*, 470 U.S. 480, 496-97, 105 S. Ct. 1459, 84 L. Ed. 2d 455 (1985). The Secretary of State essentially argues that the compelling interest served by § 14 is the encouragement of participation in the Nebraska public funding scheme, which is designed to prevent corruption or the appearance of corruption.

The Act contains the following Legislative findings:

(1) The Legislature finds that the cost of running for statewide offices and legislative seats has risen greatly and that many qualified candidates are excluded from the democratic system as a result of such rising cost. The Legislature further finds that the United States Supreme Court has indicated that any limitation on campaign expenditures must be entered into voluntarily and that the utilization of public financing of campaigns is a constitutionally permissible way in which to encourage candidates to adopt voluntary campaign spending limitations. The Legislature further finds that using public funds to assist in the financing of campaigns for certain statewide offices and legislative seats, in conjunction with voluntary campaign spending limitations, will increase the number of qualified candidates able to run for office.

(2) The Legislature finds that there is a compelling state interest in preserving the integrity of the electoral process

in state elections by ensuring that these elections are free from corruption and the appearance of corruption and that this end can only be achieved if (a) reasonable limits are placed on the amount of campaign contributions from certain sources and (b) the sources of funding and the use of that funding in campaigns are fully disclosed.

§ 32-1602. The Secretary of State argues that without § 14, the possibility of significant independent expenditures by political groups in the days just before an election is an "enormous disincentive" to participation in a public funding scheme. Brief for appellant at 29.

With respect to public campaign financing at the federal level, the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 57 n.65, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), recognized:

> Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.

The legitimacy of public campaign financing schemes was later affirmed in *Republican Nat. Committee v. Fed. Elec. Com'n*, 487 F. Supp. 280 (S.D.N.Y. 1980). Relying on these decisions, several lower courts have found that a state has a compelling interest in stimulating candidate participation in its public financing scheme, because such schemes promote political dialog among the candidates and combat corruption by reducing the candidates' reliance on fundraising efforts. See, *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993); *Wilkinson v. Jones*, 876 F. Supp. 916 (W.D. Ky. 1995). The Secretary of State relies upon these cases to support his assertion that § 14 is narrowly tailored to achieve a compelling government interest.

However, none of these cases involved restrictions upon the amount or timing of independent expenditures by groups supporting or opposing political candidates. In *Rosenstiel*, a Minnesota statute provided that a publicly funded candidate was released from the expenditure limit when his privately funded opponent received contributions or made expenditures equaling

20 percent of the applicable limit prior to 10 days before the primary election, and contributions or expenditures equaling 50 percent of the applicable limit thereafter. A privately funded candidate argued this statute burdened his First Amendment rights because he was coerced into accepting the public funding scheme. The Eighth Circuit Court of Appeals found that such statute was not a burden on a privately funded candidate because the scheme remained voluntary. The court then noted, in dicta, that the statutory scheme was narrowly tailored to achieve a compelling governmental interest because it was designed to promote a reduction in the possibility of corruption by encouraging participation in the public financing scheme. Specifically, it found that the expenditure limitation waiver by which the publicly financed candidate could retain the public subsidy while exceeding the statutory spending limitations was narrowly tailored to remove the disincentive a candidate may have to participate in the public funding scheme because of concern over "being grossly outspent by a privately financed *opponent* with no expenditure limit." (Emphasis supplied.) *Id.* at 1551.

In *Vote Choice, Inc., supra,* a Rhode Island campaign finance act doubled the amount of contributions a publicly funded candidate could receive from a person or political action committee in order to encourage participation in the public funding program. A privately funded candidate challenged the statute as a burden on her First Amendment rights. The court found the "cap gap" portion of the statute was narrowly tailored to promote a compelling state interest, noting:

> The state need not be completely neutral on the matter of public financing of elections. When, as now, the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs "facilitate communication by candidates with the electorate," . . . free candidates from the pressures of fundraising, . . . and, relatedly, tend to combat corruption.

(Citations omitted.) *Id.* at 39. The court reasoned that the "cap gap" on *contributions* made it "less likely that a given contribution will tend to corrupt a candidate." (Emphasis supplied.) *Id.*

In *Wilkinson v. Jones*, 876 F. Supp. 916 (W.D. Ky. 1995), a Kentucky statute operated to release a publicly financed candidate from the spending limit of $1.8 million when the opposing, privately financed candidate exceeded that amount, either in contributions or expenditures. A privately financed candidate contended this statute was coercive on his First Amendment rights. The court first found that his free speech right was not chilled in any manner by the statute. It then noted, once again in dicta, that Kentucky had a compelling interest in encouraging candidates to accept public financing and that the "trigger" provision was narrowly tailored to achieve this goal. *Id.* at 928. Without such a trigger, the court reasoned, the publicly financed candidate would be faced with the possibility of being grossly outspent.

We deem it significant that other states have sought to eliminate disincentives to participation in publicly financed campaign schemes without placing any limitation or restriction upon those wishing to exercise political speech through independent campaign expenditures. The jurisprudence recognizes a distinction between such expenditures and contributions made directly to a candidate's campaign. The Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 412 L. Ed. 2d 659 (1976), struck down the Federal Election Campaign Act's limitation on independent expenditures by individuals and political action committees because it found that such expenditures, being uncoordinated with the candidate or his campaign, had no tendency to corrupt or to give the appearance of corruption. Distinguishing independent political expenditures from campaign contributions as a potential source of electoral corruption, the Court stated:

> Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.

*Buckley*, 424 U.S. at 47. See, also, *Nixon v. Shrink Missouri Government PAC*, No. 98-963, 2000 WL 48424 (U.S. Jan. 24, 2000).

In subsequent campaign financing cases, the Court has continued to recognize this " 'fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign.' " *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604, 614-615, 116 S. Ct. 2309, 135 L. Ed. 2d 795 (1996), quoting *FEC v. National Conservative PAC*, 470 U.S. 480, 105 S. Ct. 1459, 84 L. Ed. 2d 455 (1985). In *National Conservative PAC*, the Court struck down a federal law which prohibited independent political committees from expending more than $1,000 to further the campaign of a candidate who elected to accept public financing. The Court rejected a contention that the limitation was necessary to prevent corruption, noting that "[t]he hallmark of corruption is the financial *quid pro quo*: dollars for political favors," whereas the conduct proscribed by the statute under consideration was "not contributions to the candidate, but independent expenditures in support of the candidate." 470 U.S. at 497. For these reasons, the Court concluded that the effort to link independent expenditures to corruption or the appearance of corruption in order to show a relationship to a compelling government interest did not pass its " 'rigorous' " First Amendment standard of review. 470 U.S. at 501.

We reach the same conclusion in the present case. The record does not reflect any direct correlation between the statutory restrictions on independent political expenditures and the legitimate governmental interest in preventing corruption in the electoral process. Nor are we persuaded that the right of political groups and committees to spend as much or as little as they choose in expressing their views concerning a candidate for elective office, and to decide the timing of such expenditures, constitutes a disincentive to a candidate's participation in a public financing scheme which the state must regulate in order to prevent or minimize corruption. Were that the case, we can discern no legitimate reason why such expenditures by an individual using his or her own funds would not also be subject to regulation, yet § 14 specifically exempts such expenditures from its scope. Moreover, the record reflects that participation by candidates in Nebraska's public funding scheme, enacted in 1992,

was already high before the adoption of § 14 in that 57 of 59 candidates for the Legislature and 22 of 25 candidates for other elective state offices to which the Act was applicable elected to abide by the Act's spending limitations in 1996, thus qualifying for public funds. In the two 1996 legislative races identified as involving independent expenditures by a political committee a few days prior to the election, all four candidates had elected to abide by the spending limitations imposed by the Act, and one of the candidates supported by the committee was elected while another was defeated. In *Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994), the court found it unnecessary to even consider whether an amendment to Minnesota's public campaign financing scheme was narrowly tailored to a goal of encouraging participation in that scheme, where candidate participation in public campaign financing was nearly 100 percent before enactment of the amendment. Under these circumstances, the court determined that the state's interest, "no matter how compelling in the abstract, is not legitimate." *Id.* at 1361.

We conclude that § 14 is not narrowly tailored to any compelling state interest so as to justify the burden it imposes on the First Amendment rights of those wishing to engage in political speech supporting or opposing a candidate through independent expenditures which are neither coordinated with nor controlled by a candidate's campaign.

## CONCLUSION

Based upon our independent review, we determine that § 14, as codified at § 32-1614, unconstitutionally infringes upon the right of groups and committees to engage in political speech through the making of independent expenditures as defined by Nebraska law. We agree with the district court that § 14 is severable from the remaining provisions of L.B. 420, which are not affected by our holding. Accordingly, we affirm the judgment of the district court.

AFFIRMED.